**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOSEPH D. LENTO, ESQ., an individual,<br><br>LENTO LAW FIRM, LLC, a limited liability company,<br><br>     Plaintiffs,<br><br>  v.<br><br>KEITH ALTMAN, ESQ., an individual,<br><br>THE LAW OFFICE OF KEITH ALTMAN, PLLC, a/k/a "K ALTMAN LAW", a limited liability company,<br><br>    Defendants. | Civil Action No.:<br><br><br>**ORDER TO SHOW CAUSE<br>FOR A<br>TEMPORARY RESTRAINING ORDER<br>AND PRELIMINARY INJUNCTION** |

   **THIS MATTER** having been opened to the Court by Plaintiffs JOSEPH D. LENTO, ESQ. and LENTO LAW FIRM, through their attorneys, Lento Law Group, P.C., 3000 Atrium Way, #200, Mt. Laurel, NJ 08054, by Order to Show Cause seeking a temporary restraining order and preliminary injunction pursuant to Federal Rule of Civil Procedure 65 and L. Cv. R. 65.1, and upon the Verified Complaint, Attorney Certification, and Memorandum of Law submitted herewith, the Court having determined that good and sufficient reasons exist to proceed by way of Order to Show Cause, and for good cause shown.

   **IT IS** on this _____ day of _____ , 2022,

   **ORDERED** that the Defendants appear and show cause on the _____ day of _____, 202, before the United States District Court for the District of New Jersey, Hon. _____, at the _____ US Courthouse, located at

_____, New Jersey _____, at _____ o'clock in the _____ noon, or as soon thereafter as counsel can be heard, why an Order should not be entered;

1. Preliminarily enjoining and restraining the Defendants from abandoning, neglecting, referring back to Plaintiffs, or otherwise ceasing work on any of the matters which are the subject of any of Defendants' agreements with Plaintiffs;

2. Preliminarily enjoining and restraining the Defendants from disparaging Plaintiffs to any clients or potential clients, and from providing any clients or potential clients with any information that is inconsistent with any of the parties' agreements;

3. Preliminarily enjoining and restraining the Defendants from engaging in any advertising for legal services for students, taking on any new student cases outside of the terms of the agreement with Plaintiffs, and otherwise violating the noncompete agreement with Plaintiffs; OR in the alternative, preliminarily enjoining and restraining the Defendants from continuing to use the intellectual property, goodwill, advertising efforts, client reviews, and any other client development work rightfully belonging to the Plaintiffs, for Defendants' own private business.

4. Granting such other relief as the Court deems equitable and just.

And it is further **ORDERED** that:

1. Pending further hearing on this Order to Show Cause, defendants are temporarily enjoined and restrained from abandoning, neglecting, referring back to Plaintiffs, or otherwise ceasing work on any of the matters which are the subject of any of Defendants' agreements with Plaintiffs;

2. Pending further hearing on this Order to Show Cause, Defendants are temporarily enjoined and restrained from disparaging Plaintiffs to any clients or potential clients,

and from providing any clients or potential clients with any information that is inconsistent with any of the parties' agreements;

3.  Pending further hearing on this Order to Show Cause, defendants are temporarily enjoined and restrained from engaging in any advertising for legal services for students, taking on any new student cases outside of the terms of the agreement with Plaintiffs, and otherwise violating the noncompete agreement with Plaintiffs.

4.  Pending further hearing on this Order to Show Cause, defendants are temporarily enjoined and restrained from continuing to use the intellectual property, goodwill, advertising efforts, client reviews, and any other client development work rightfully belonging to the Plaintiffs, for Defendants' own private business.

5.  A copy of this Order to Show Cause, Complaint, supporting affidavits, declarations or certifications, and Memorandum of Law submitted in support of this application, together with a summons, shall be served upon the Defendants personally within _____ days of the date hereof, in accordance with FRCP 4.

6.  The Plaintiff must file with the Court its proof of service of the pleadings on the Defendants no later than three (3) days before the return date.

7.  Defendants shall file and serve a written response to this Order to Show Cause and proof of service by _____, 2013. You must send a courtesy copy of your opposition papers directly to Judge _____, whose address is: _____, New Jersey _____.

8.  The Plaintiff must file and serve any written reply to the Defendants' opposition to the Order to Show Cause by _____, 2022. A courtesy copy of

the reply papers must be sent directly to the chambers of Judge

_____.

9.  If the Defendants do not file and serve opposition to this Order to Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that the Plaintiff files a proof of service and a proposed form of Order at least three days prior to the return date.

10. If the Plaintiff has not already done so, a proposed form of Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the Court no later than three (3) days before the return date.

11. The Court will notify the parties whether it will entertain argument on the return date of the Order to Show Cause in accordance with Local Civil Rule 78.1.


_____

United States District Court Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOSEPH D. LENTO, ESQ., an individual, | |
| LENTO LAW FIRM, LLC, a limited liability company, | |
| Plaintiffs, | Civil Action No.: |
| v. | |
| KEITH ALTMAN, ESQ., an individual, | **MEMORANDUM OF LAW** |
| THE LAW OFFICE OF KEITH ALTMAN, PLLC, a/k/a "K ALTMAN LAW", a limited liability company, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.     FACTUAL BACKGROUND

1.     On or about January 31, 2020, Plaintiff Lento founded Lento Law Firm, LLC ("LLF"), a Pennsylvania-based law firm.

2.     Plaintiff Lento had been aware of Defendant Altman's reputation as an attorney and was considering him for a future associate position within LLF as far back as December 2019, if not earlier.

3.     Lento and Altman finally connected by phone in or around March 2020 at LLF's New Jersey office and came to an arrangement with respect to the shared handling of

student defense matters involving such things as academic misconduct, student code of conduct violations, and Title IX violations, for example.

4.     From approximately March 2020 to August 2020, Lento began associating his student defense cases to Altman for Altman to take the lead on, under a verbal agreement that all attorneys' fees collected for pre-litigation student defense matters would be split 60/40, with 60% of the fee going to Lento as the attorney of record and the progenitor of the matters, and with 40% going to Altman for his time and labor.

5.     Importantly, it was discussed and agreed as between Lento and Altman that this 60/40 split would occur only after LLF's incurred marketing expenses has been deducted from the total fee.

6.     It was agreed that deducting LLF's marketing expenses off the top prior to the fee split was the only method of fairly and proportionately compensating both Lento and Altman, for if LLF's expenses were deducted from Lento's 60% share post-split, Altman, comparatively, would be receiving a windfall for each matter considering he was associated into each matter by Lento, the originating attorney.

7.     By approximately August 2020, Lento began a limited Pay Per Click (PPC) ad campaign for LLF's student defense practice, which resulted in a marked increase in the firm's volume of student defense cases.

8.     By approximately January 2021, Lento increased the PPC ad budget and the number of student defense leads LLF received increased significantly.

9.     Throughout 2021, however, Plaintiff Lento began noticing that problems were arising with respect to Defendant Altman's handling of the student defense matters.

10.     Specifically, Altman had failed on more than one occasion to follow-up with clients' phone calls and emails, which lead to several matters not being handled in a timely manner, such that the clients became frustrated and demanded the issuance of a refund of their retainer, which Lento and LLF had no choice but to issue.

11.     By the Spring of 2021, the business relationship between Lento and Altman began to sour when Altman began demanding that Lento pay him a larger share of the fees collected in the student defense matters.

12.     Further, although it was Altman's responsibility to send out fee agreements to sign new clients, Lento eventually discovered that Altman had been neglecting to do so, and so many of the early student defense cases which Altman handled for LLG were performed pursuant to no client fee agreement.

13.     This failure to send client fee agreements was also partially the fault of Defendant ANTOINETTE MONK ("Monk"), Altman's Administrative Assistant, who was also responsible for many of the Altman Firm's administrative duties, but who would regularly send out client fee agreements to new clients weeks or even months after the clients had paid their retainer for legal services.

14.     Additionally, around this time Altman's poor handling of a particular matter involving a dental school student resulted in the client leaving LLF a negative review online.

15.     Lento confronted Altman about the negative review, expressing to him the seriousness with which Lento takes bad reviews of his practice, saying, "This is my business's reputation on the line here!" (paraphrasing).

16.     To Lento's discomfort, Altman responded, "This is *my* business too," which, of course, it neither was then, nor is presently, as Altman has never had an ownership interest in LLF.

17.     Altman's co-opting of Lento's business became most apparent in roughly mid-2021 when Lento discovered that initial letters of representation in student defense matters which had theretofore been transmitted on LLF letterhead were now being sent out by Altman on letterhead for Defendant The Law Office of Keith Altman, PLLC, also known as  "K Altman Law" ("the Altman Firm").

18.     In or about October or November of 2021, Altman again demanded more money from Lento, expressing that it was money Lento "owed" him, despite the fact that Altman had consistently been paid his agreed-upon share of total collected fees.

19.     After Altman threatened suing Lento for the money he believed he was owed, Lento suggested the pair keep a more regular and more detailed accounting of the fee's collected such that there could be no question as to who was owed what.

20.     By January 2022, Defendant Altman suggested to Plaintiff Lento a restructuring of their verbal agreement, and proposed two options for Lento to chose from: (1) to continue in the manner they had been, however, with a new fee-sharing scheme where Altman got a larger share of the split fee – 55/45 or 50/50 perhaps, the newly proposed split was never settled upon – or (2) to keep the current 60/40 split, but with the modification that in addition to Lento & LLF's marketing expenses coming off  the top of the total fee, Altman and the Altman Firm's operating expenses (which Altman indicated were in the area of $50,000.00 per month) would come off the top as well prior to the split being assessed.

21.     By February 2022, Lento and Altman came to an agreement with respect to the modification of the fee split.

22.     The new agreed-upon split was that Lento was to receive 55% of the fee and Altman 45% of the fee, again, after Lento and LLF's marketing expenses were taken off the top, however, this time with Lento getting 75% of all consultation fees (reduced from 100%) from January 1, 2022 onward, in exchange for a lowered 25% to Lento of all monies recovered in suit.

23.     This new understanding with respect to the fee sharing arrangement between Lento and Altman was never memorialized in a writing, however, it was understood and agreed-upon as between the two of them.

24.     An additional component of the original verbal understanding between Lento and Altman, and which was never subsequently modified or eliminated, was a verbal non-compete clause on the part of Altman and the Altman Firm.

25.     In essence, the agreement between Lento and Altman was that all student defense cases which Altman handled would be those and only those which were worked collaboratively with Lento and LLF pursuant to their arrangement. In other words, Altman agreed to handle these student defenses cases exclusively in association with Lento and LLF.

26.     In consideration of Lento having started the Student Defense business as far back as 2013 (or earlier) and Lento's larger share of the fee split, Lento agreed to advertise for student defense matters as alleged earlier, through such means as online ad campaigns and Pay Per Click ("PPC"), and that as Altman would only be handling such matters with Lento and LLF, he was prohibited from advertising independently for case of that nature.

27.     Lento and LLF's marketing was therefore mutually beneficial to both Lento and Altman as Altman would stand to profit from all student defense cases Lento and LLF took on.

28.     Despite this exclusivity provision in which Altman agreed not to compete with Lento with respect to student defense cases, by approximately December of 2021, Lento became aware of the fact that Altman had changed his website and his email signature to reflect his practice involving student defense matters.

29.     By mid-2022, Altman unveiled an entirely revamped website for the Altman Firm, with a Home Page blatantly advertising for student defense and Title IX matters, and numerous other pages across the site related to such areas of practice. *See* a screen capture from Defendant Altman's website located at https://www.kaltmanlaw.com/ below as **IMAGE 1**.

**IMAGE 1.**



30.     Additionally, with reference to Defendant Altman's website, some of the testimonials listed in the "Student Stories" tab located at https://www.kaltmanlaw.com/student-stories are testimonials from clients of Lento and LLF to whom Altman was merely assigned to handle their matter pursuant to the subject oral agreement, not clients of Altman or the Altman Firm.

31.     Furthermore, Defendant Altman's website largely copied Lento's website by simply paraphrasing each section. For example, compare https://www.studentdisciplinedefense.com/disciplinary-charges with https://www.kaltmanlaw.com/student-defense.

32.     Defendant Altman's underhanded and self-serving conduct despite the terms of his oral agreement with Plaintiff Lento came to a head on or about July 24, 2022, when Altman, on a telephone call with Lento, made demand that Lento pay him $500,000.00 by the following day, July 25, 2022, or else he would (1) file a lawsuit against Lento, (2) file a State Bar complaint against Lento, and (3) that he and the Altman Firm would send out a mass email to all of the approximately one-hundred (100) open student defense clients informing them he would be ceasing work on their matters as Lento has not paid him.

33.     Apart from the fact that Plaintiff Lento could not possibly produce the demanded $500,000.00 by the following day, he also contested that Defendant Altman was even entitled to such a ridiculous sum, and further, Lento advised Altman that if Altman intended to stop working on the clients' matters, he had an ethical obligation to return the case files to Lento and LLF such that Lento and LLF could continue to work on them so as to not prejudice the clients.

34.     Plaintiff Lento, despite not conceding that he nor LLF owed Defendant Altman anything, offered to settle the dispute by paying Altman $365,000.00 simply so Altman would not slander Lento to the clients, nor unjustly hold hostage the clients' matters by ceasing work thereon.

35.     Pursuant to this offer to settle the fee dispute, a settlement agreement was drafted wherein Altman and the Altman Firm would continue to work on the student defense matters until the end of that week, in other words, until Saturday, July 30, 2022, in exchange for Lento paying the begrudgingly agreed upon $365,00.00.

36.     Upon further consideration, however, and upon the realization that he was being extorted by Altman, Lento refused to pay the $365,000.00 Altman demanded, as there was no justification for the demand given that Altman had been consistently paid pursuant to their oral agreement and could not or refused to produce an account demonstrating his alleged entitlement to the $365,000.00, let alone his entitlement to the $500,000.00 originally demanded.

37.     Additionally, Lento refused to pay extortionate demand because logistically, if he had complied, paid the demand, and Altman, in exchange, had returned the nearly one-hundred (100) open matters to Lento and LLF, (1) Lento and LLF would not have been equipped in terms of staffing and resources to accommodate the sudden influx of all of those matters, and (2) the disruption this transition would cause to the clients could have created problems in the handling of those matters, ultimately resulting in potential bar complaints or client refunds – in other words, additional exposure to Lento on top of the extorted $365,000.00 to Altman.

In light of the foregoing, Plaintiff Lento realizes that has been the victim of a criminal enterprise in in the form of the Altman Firm, headed by Defendant Keith Altman, and perpetrated by Altman in concert with the help of his staff, having nearly been successfully extorted for hundreds of thousands of dollars upon the threat of significant professional and reputational injury.

## II.     LEGAL ARGUMENT

### a.  Legal Standard

It is well settled that "[a] party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). These injunctions are generally granted to maintain the status quo. Acierno v. New Castle Cty., 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered.")

Irreparable harm must be something more than pure economic loss; plaintiffs must show that the harm they will suffer if the injunction is not granted is not the type of harm that can be remedied by a money judgment at the end of the case. Adams v. Freedom Forge Corp., 204 F.3d 475, 484–85 (3d Cir. 2000) ("The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages."). The likelihood of this harm occurring must be more than a remote risk, and it cannot be purely speculative. Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351 (3d Cir.1980) ("More than a risk of irreparable harm must be demonstrated.

The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury....'"")

So what can constitute grounds for finding irreparable injury? "Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990). Additionally, "[a] finding of irreparable injury can also be based on likely confusion." Id. at 196.

This Court has also held that potential loss of a business enterprise itself can be an irreparable harm entitling a plaintiff to an injunction, even though one might in theory be able to calculate the lost profits:

> Judge Friendly found unpersuasive Ford's contention that Semmes had not demonstrated resulting irreparable harm from its termination of the dealership. He found that there was something else present—something intangible—that was not quantifiable in monetary terms: Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award.... Moreover, they want to continue living.

Atl. City Coin & Slot Serv. Co. v. IGT, 14 F. Supp. 2d 644, 667 (D.N.J. 1998):

The Third Circuit has agreed with this reasoning as well. Bateman v. Ford Motor Co., 302 F.2d 63, 66 (3rd Cir. 1962) ("[J]udgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise' for many years").

In addition to finding irreparable harm from the loss of a business enterprise, this Court and the Third Circuit will find there has been irreparable harm when a lost business relationship was "unique" or "uniquely important." Atl. City Coin & Slot Serv. Co. v. IGT, 14 F. Supp. 2d

644, 667 (D.N.J. 1998); Acierno v. New Castle Cnty., 40 F.3d 645, 654 (3d Cir. 1994). Courts in this Circuit will also issue preliminary injunctions based on finding irreparable harm due to violations of non-compete clauses. *See, e.g.,* HR Staffing Consultants LLC v. Butts, 627 F. App'x 168 (3d Cir. 2015); Tilden Recreational Vehicles, Inc. v. Belair, 786 F. App'x 335, 342 (3d Cir. 2019) (finding that the plaintiff would suffer irreparable harm unless injunction enforcing non-compete clause was issued, since "Belair might harm BNRV's customer goodwill by using his training, confidential information, and personal customer goodwill to attract sales and customer loyalty from BNRV to Chesaco.") Healthcare Servs. Grp., Inc. v. Fay, 597 F. App'x 102, 104 (3d Cir. 2015) ("Moreover, the violations that occurred in this case—where Fay and Konopka not only worked for a competitor but also interfered with Healthcare's customer relationships by attending the sales meetings—are particularly worthy of a preliminary injunction and indeed may be "quintessential irreparable injuries" because they implicate indeterminate future losses of clients and revenue"); Nat'l Bus. Servs., Inc. v. Wright, 2 F.Supp.2d 701, 709 (E.D.Pa.1998) ("In covenant not to compete cases, the "nature of the right that is injured," i.e., the former employer's legitimate interest in protecting its business, makes equitable relief appropriate.") Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC, 918 F. Supp. 2d 407, 418 (E.D. Pa. 2013) (holding that violations of covenants not to compete can result in the likelihood of loss of control of reputation, loss of trade, and loss of good will sufficient to warrant relief); National Reprographics, Inc. v. Strom, 621 F. Supp. 2d 204 (D. N.J. 2009).

### b. Defendants Must Be Enjoined From Sabotaging Clients' Matters.

Defendants should be temporarily enjoined and restrained from abandoning, neglecting, referring back to Plaintiffs, or otherwise ceasing work on any of the matters which are the subject of any of Defendants' agreements with Plaintiffs. Returning first to the factors for

injunctive relief, Plaintiffs must show (1) a likelihood of success on the merits; (2) that they will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the Defendants; and (4) that the public interest favors such relief. Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). Here, Defendants are extorting Plaintiffs, by threatening to file a fraudulent bar complaint, and have already abandoned work on approximately 100 matters if Plaintiffs do not pay Defendants half a million dollars which Plaintiffs do not owe.

(1) Plaintiffs are extremely likely to win on the merits on this issue because extortion is a serious crime, and Defendants have an ethical obligation to refrain from dishonest and criminal conduct, as well as an ethical obligation to not abruptly neglect and abandon working on their clients' matters, to the clients' detriment, based on the alleged actions of a third party. *N.J.S.A. § 2C:20-5; N.J. R.P.C. 1.16, 4.1(a)(1) & 8.4(a)-(d).*

(2) Both Plaintiffs and the 100 clients whose matters are at risk will suffer immediate and irreparable harm if Defendants are not enjoined from ceasing their abandonment of these matters. Defendants have already abandoned these matters, so the harm is already occurring. This abandonment seriously harms the reputation of Plaintiffs, both because Defendants have threatened to tell the clients that the abandonment is the fault of Plaintiffs for not paying, and because the clients' matters will suffer harm from Defendants failing to work on them, reflecting poorly on Plaintiffs generally and damaging Plaintiffs' reputation with these clients. Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990) ("Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.")

Even if Defendants referred these matters back to Plaintiffs, Plaintiffs' schedule is filled with other matters (which is part of why the agreements with Defendants were made) which

means that there is a very high likelihood that Plaintiffs would need to refer the cases to outside attorneys and/or refund their retainer fees (which would disappoint all of these clients, who signed up based on Plaintiffs' reputation) or risk missing deadlines and harming the clients' matters, which would also cause irreparable reputational damage. Id.  Furthermore, Defendants have abruptly ended the business enterprise which they have entered into with Plaintiffs, and the loss of this enterprise that would occur without an injunction to halt it would constitute irreparable harm. Bateman v. Ford Motor Co., 302 F.2d 63, 66 (3rd Cir. 1962) ("[J]udgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise' for many years"); Atl. City Coin & Slot Serv. Co. v. IGT, 14 F. Supp. 2d 644, 667 (D.N.J. 1998) (Adoption the reasoning of a Second Circuit case in which that court held that "the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award.... Moreover, they want to continue living.")

This agreement with Defendants is also unique and presents a unique opportunity for Plaintiffs (and Defendants, for that matter) that ordinary referral relationship do not offer, because it is atypical in the unique fee-sharing arrangement, the unique mutually beneficial advertising arrangement that was agreed to between the parties, and its unique with respect to the sheer volume of cases the agreement affected. Losing this would therefore cause Plaintiffs irreparable harm. Atl. City Coin & Slot Serv. Co. v. IGT, 14 F. Supp. 2d 644, 667 (D.N.J. 1998); Acierno v. New Castle Cnty., 40 F.3d 645, 654 (3d Cir. 1994).

Needless to say, the clients would also suffer significant irreparable harm from Defendants' conduct if it is not immediately enjoined.

(3) Granting this preliminary relief will not result in even greater harm to the Defendants. The only arguable "harm" Defendants could suffer if enjoined from abandoning these matters would be the the that they would have to keep doing their jobs. That "harm" is insignificant. Even taking as true Defendant's preposterous claim that Plaintiffs owe them $500,000, and Defendants cannot afford to run their business without it, the harm of securing a loan pales in comparison to the harm Plaintiffs and the clients would suffer if Defendants were permitted to commit more counts of felony extortion against Plaintiffs, and continue sabotaging the matters of 100 different clients. Forcing Defendants to obey the law and the Rules of Professional Conduct does not constitute "harm" by any definition, much less "irreparable harm," nor does losing the leverage they were using to criminally extort Plaintiffs for half a million dollars.

(4) The public interest favors issuing this injunction. It is axiomatic that the public interest is served by people obeying criminal laws. Likewise, the public interest is served by lawyers abiding by the Rules of Professional Conduct. Additionally, public interest weighs heavily in favor of preventing the deliberate sabotage of 100 client matters, both to uphold public trust in the legal profession, and because those 100 clients are members of the public whose interests must be considered here. Furthermore, this injunction would simply enforce the *status quo*, as Plaintiffs are requesting the Court to prohibit Defendants from abandoning their ethical and contractual obligations to work on these matters, so public interest favors issuing the injunction. Acierno v. New Castle Cty., 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered.")

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this Court temporarily enjoin Defendants from abandoning, neglecting, referring back to Plaintiffs, or

otherwise ceasing work on any of the matters which are the subject of any of Defendants'
agreements with Plaintiffs.

### c. Defendants Must Be Enjoined From Disparaging Plaintiffs and Misleading Clients.

Defendants should be temporarily enjoined and restrained from disparaging Plaintiffs to
any clients or potential clients, and from providing any clients or potential clients with any
information that is inconsistent with any of the parties' agreements. Defendants have threatened
to mass message approximately 100 clients to inform them that Defendants will no longer be
working on their matters, based on the false claim that Plaintiffs owe Defendants half a million
dollars. Defendants have also been sending out retainer agreements on their own letterhead when
those clients agreed to hire Lento Law Firm and Plaintiff Lento as the attorney of record.

(1) Plaintiffs are likely to win on the merits on this issue because Defendants' proposed
statements to the clients are quite harmful and provably false (since Plaintiffs do not owe
Defendants $500,000 and never agreed to pay them that sum), and Plaintiffs have written
evidence multiple witnesses who can attest to this. Plaintiffs are also likely to win on the merits
because the agreements between the parties are clear and plainly delineate the parties' financial
responsibilities, division of labor, and which firm's name must be used (and again, Plaintiffs
have evidence and witnesses to support their position). Defendants' past actions and threatened
future actions flagrantly violate these agreements.

Furthermore, as explained in **Section II.b**, *supra*, it would be a crime for Defendants to
continue to extort Plaintiffs by sending out these messages, and it would be unethical for
Defendants to abruptly abandon 100 clients and sabotage their cases, so at the very least,

Plaintiffs are likely to be successful on the merits of their request that Defendants be enjoined from sending those messages, regardless of the reason.

(2) Plaintiffs will suffer immediate and irreparable harm if Defendants are not enjoined from disparaging Plaintiffs and misleading clients. Plaintiffs would suffer significant injury to their reputation and the goodwill they have built up if Defendants sent out the disparaging and misleading message they have threatened to send. Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990) ("Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.") As explained in **Section II.b** above, sending out these messages would seriously harm the reputation of Plaintiffs and also harm the interests of the clients.

Additionally, Plaintiffs will suffer irreparable harm if Defendants persist in misleading clients by sending out retainer agreements on their own letterhead (rather than Plaintiffs' letterhead, as agreed), which will create significant confusion for the clients, and also harm Plaintiffs' reputation and squander Plaintiffs' earned goodwill, since these clients signed up based on Plaintiffs' reputation and will be disappointed when they see that their retainer agreement is with Defendants, rather than Plaintiffs, as expected. Opticians Ass'n of Am. v. Indep. Opticians of Am., *supra,* at 196. ("A finding of irreparable injury can also be based on likely confusion.") Defendants have already threatened to send these messages out this week, and they have already been sending out the deceptive letterheads, so the potential harm is imminent or already occurring.

(3) Granting this preliminary relief will not result in even greater harm to the Defendants because being compelled to not lie to clients cannot constitute "harm." Nor can being compelled to follow the terms of the agreement they made, which they were previously following without

issue. Any detriment Defendants suffer from being unable to send out retainers on their own letterhead is simply them losing out the unjustifiable windfall they would have obtained from breaching their agreements with Plaintiffs. That is not truly a "loss" since they were never entitled to it in the first place, and by no account could such a "loss" compare to the loss of goodwill and reputation resulting from Defendants usurping Plaintiffs' clients by using their own letterhead, not to mention the devastating reputational blow that Plaintiffs would suffer if Defendants sent their libelous and extortionate letter.

(4) The public interest favors issuing this injunction. The public interest is served if lawyers refrain from making false representations in the course of practicing law. *N.J. R.P.C. 4.1*. Clients need to know that what their lawyers tell them is true. Clients also need to have clarity in who their lawyers actually are for many important reasons, including so they know who to hold responsible for conducting legal work on their behalf and so they know whether their communications with a lawyer are privileged or not, so deceiving them or creating confusion about who their lawyer is harms the public interest. Furthermore, this injunction would simply enforce the *status quo*, as Plaintiffs are requesting the Court to prohibit Defendants from lying to clients (as the ethical rules already do), so public interest favors issuing the injunction. Acierno v. New Castle Cty., 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered.")

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this Court temporarily enjoin Defendants from disparaging Plaintiffs to any clients or potential clients, and from providing any clients or potential clients with any information that is inconsistent with any of the parties' agreements.

    **d.  Defendants Must Be Enjoined From Violating Their Non-Compete Clause and Usurping Plaintiffs' Advertising and Goodwill.**

The Court should temporarily enjoin Defendants from engaging in any advertising for legal services for students, taking on any new student cases outside of the terms of the agreement with Plaintiffs, and otherwise violating the noncompete agreement with Plaintiffs; OR in the alternative, enjoin Defendants from continuing to use the intellectual property, goodwill, advertising efforts, client reviews, and any other client development work rightfully belonging to the Plaintiffs, for Defendants' own private business.

As part of the non-compete agreement, Defendants agreed not to advertise for any student matters (such as Title IX and student discipline matters). Nevertheless, Defendants breached that agreement by restructuring their entire website to advertise for those exact matters. Not only that, Defendants copied and adapted Plaintiffs' own website in doing so, appropriating not only Plaintiffs' intellectual property, but also the goodwill and strong reputation Plaintiffs have earned.

(1) Plaintiffs are likely to win on the merits on this issue because Defendants' advertisements are in clear breach of the agreements with Plaintiffs, and Plaintiffs have written evidence multiple witnesses to prove it. Defendants' ongoing advertisements for student matters flagrantly violate these agreements.

The non-compete agreement is likely to be upheld because it is for an honest and just purpose (the practice of law to help students); it was established for the protection of the legitimate interest of the party in whose favor it is imposed (Lento Law Firm has a legitimate interest in restricting Defendants' advertising and practice in that area of law, since Lento Law Firm was funding that practice, and had an exclusive agreement with Defendants in which both

firms could only work on cases in that area if they were shared according to the fee sharing agreement); the clause is reasonable as between the parties to the contract because it only limits advertising in a single area of law and generously compensates Defendants in exchange; and it is not specially injurious to the public, since it only affects the advertising of one law firm, and the public can readily access advertisements of hundreds of similar firms not bound by the clause. St. Clair Med., P.C. v. Borgiel, 270 Mich. App. 260, 266, 715 N.W.2d 914, 919 (2006); *M.C.L.A. § 445.774a.*

(2) Plaintiffs will suffer immediate and irreparable harm if Defendants are not enjoined from abandoning these matters. Plaintiffs have already been suffering this harm, so there is no question about whether it will occur. The harm Plaintiffs are suffering is irreparable because Defendants' appropriation of Plaintiffs' website creates a significant likelihood of confusion by using virtually the same wording. Opticians Ass'n of Am. v. Indep. Opticians of Am., *supra,* at 196. ("A finding of irreparable injury can also be based on likely confusion.") Defendants' appropriation of the Plaintiffs' website language and usurpation of Plaintiffs' clients harms Plaintiffs' reputation and goodwill, and deprives Plaintiffs of clients, of control of their business, of control of their reputation, which constitutes irreparable harm. Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990) ("Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.")

Plaintiffs are also suffering irreparable harm due to Defendants' violation of the non-compete clause. HR Staffing Consultants LLC v. Butts, 627 F. App'x 168 (3d Cir. 2015); Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC, 918 F. Supp. 2d 407, 418 (E.D. Pa. 2013) (holding that violations of covenants not to compete can result in the likelihood of loss of control of reputation, loss of trade, and loss of good will sufficient to warrant [injunctive]

relief). Defendants' violations of the noncompete clause subject Plaintiffs to indeterminate past and future losses of clients and revenue as Defendants usurp those clients using Plaintiffs' own website language and in violation of the agreements with Plaintiffs, and these indeterminate losses constitute irreparable harm. Healthcare Servs. Grp., Inc. v. Fay, 597 F. App'x 102, 104 (3d Cir. 2015) ("Moreover, the violations that occurred in this case—where Fay and Konopka not only worked for a competitor but also interfered with Healthcare's customer relationships by attending the sales meetings—are particularly worthy of a preliminary injunction and indeed may be "quintessential irreparable injuries" because they implicate indeterminate future losses of clients and revenue").

(3) Granting this preliminary relief will not result in even greater harm to the Defendants. Any harm Defendants will suffer is purely financial due to bringing in less business from the removed advertisements (which can be recompensed if necessary), while the harm Plaintiffs are suffering is reputational, indeterminate, and irreparable. Id. Should the Court decide to permit the Defendants to violate the non-compete clause pending the resolution of the case, requiring Defendants to rephrase their advertising would likewise cause them minimal harm.

(4) The public interest favors issuing this injunction. The public interest is served if non-compete clauses are upheld and businesses are prevented from stealing clients by using trickery and disguise. Furthermore, the public interest is also served when confusion is eliminated as to who exactly is representing a client. As explained before, it is essential for many reasons that clients know who is their lawyer and who is not, including so they know who to hold responsible for conducting legal work on their behalf and so they know whether their communications with a lawyer are privileged or not. Deceiving clients or creating confusion about who their lawyer is harms the public interest. Furthermore, this injunction would simply enforce the *status quo*, as

Plaintiffs are requesting the Court to require Defendants to continue abiding by the non-compete agreement that was in place for years, so public interest favors issuing the injunction. Acierno v. New Castle Cty., 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered.")

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this Court temporarily enjoin Defendants from engaging in any advertising for legal services for students, taking on any new student cases outside of the terms of the agreement with Plaintiffs, and otherwise violating the noncompete agreement with Plaintiffs; OR in the alternative, enjoin Defendants from continuing to use the intellectual property, goodwill, advertising efforts, client reviews, and any other client development work rightfully belonging to the Plaintiffs, for Defendants' own private business.

### III.    CONCLUSION

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this Court grant all of the relief set forth in the attached Order to Show Cause.

Respectfully,

Samuel D. Jackson, Esq.
*Attorney for Plaintiffs*
NJ State Bar No. 130452017
3000 Atrium Way, Suite 200
Mt. Laurel, New Jersey 08054
856.652.6500 (Office)
856.375.1010 (Fax)
sdjackson@lentolawgroup.com