```
 1                 UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 2

 3   ━━━━━━━━━━━━━━━━━━━━━━━━━━

     JOSEPH D. LENTO, ESQUIRE, an      CIVIL ACTION NUMBER:
 4   individual, and LENTO LAW
     FIRM, LLC, a limited                 22-4840(RBK)(EAP)
 5   liability company,
                                       Motion Hearing
 6        Plaintiffs,

 7        v.

 8   KEITH ALTMAN, ESQUIRE, an
     individual, and THE LAW
 9   OFFICE OF KEITH ALTMAN,
     PLLC, a limited liability
10   company, et al.,

11        Defendants.
     ━━━━━━━━━━━━━━━━━━━━━━━━━━
12        Mitchell H. Cohen Building & U.S. Courthouse
          4th & Cooper Streets
13        Camden, New Jersey  08101
          August 4, 2022
14        Commencing at 10:42 a.m.

15   B E F O R E:            THE HONORABLE ROBERT B. KUGLER,
                             UNITED STATES DISTRICT JUDGE
16   A P P E A R A N C E S:

17        LENTO LAW GROUP, P.C.
          BY:  SAMUEL JACKSON, ESQUIRE
18        3000 ATRIUM WAY, SUITE 200
          MOUNT LAUREL, NJ 08873
19        For the Plaintiffs

20        FOSTER, P.C.
          BY:  HOWARD W. FOSTER, ESQUIRE
21        10 S. RIVERSIDE PL., SUITE 875
          CHICAGO, IL 60606
22        For the Plaintiffs

23             Sharon Ricci, Official Court Reporter
                  sharon.ricci.usdcnj@gmail.com
24                      267-249-8780

25   Proceedings recorded by mechanical stenography; transcript
              produced by computer-aided transcription.
```

1

2
**A P P E A R A N C E S (Continued):**

3
THE LAW OFFICES OF KEITH ALTMAN
BY:  KEITH ALTMAN, ESQUIRE

4
33228 WEST 12 MILE ROAD, SUITE 375
FARMINGTON HILLS, MI 48334

5
Appearing pro se

6

7
**A L S O   P R E S E N T:**

8
                    Lori Crusselle, Paralegal

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

*****

2

**EXAMINATIONS**                                                    **PAGE**

3

**JOSEPH LENTO**                                                        8

4    DIRECT EXAMINATION OF JOSEPH LENTO BY THE                    8
     COURT:

5    CROSS-EXAMINATION OF JOSEPH LENTO BY MR.                    22
     ALTMAN:

6

7                               *****

               **E X H I B I T S**

8

     (None presented.)

9

10                             *****

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS held via Zoom teleconferencing before The
2    Honorable ROBERT B. KUGLER, United States District Judge, at
3    10:42 a.m.)
4          THE COURT:  Mr. Altman, are you a member of the New
5    Jersey Bar?
6          MR. ALTMAN:  I am not, Your Honor.  I'm here today
7    representing myself and the Law Office of Keith Altman, which
8    was part of the time a sole proprietorship, and is now a single
9    member LLC, PLLC.  The other defendants have not been served
10   yet.
11         THE COURT:  This is a highly technical matter, but a
12   corporation cannot be pro se, so you're going to have to get a
13   lawyer to represent them at some point.  But we don't need to
14   worry about that today.
15         Are we on the record, Sharon?
16         THE COURT REPORTER:  Yes, Your Honor.
17         THE COURT:  We'll start with the appearance of
18   counsel.  Let's start with the plaintiffs' counsel, please.
19         MR. JACKSON:  Good morning, Your Honor, Samuel Jackson
20   from Lento Law Group representing the plaintiffs, Joseph Lento
21   and Lento Law Firm.
22         MR. FOSTER:  And, Your Honor, I am Howard Foster.  I
23   was just retained yesterday.  I'm representing the plaintiffs
24   also in this matter.
25         THE COURT:  Who's going to speak today on behalf of

1  the plaintiffs on this application?

2          MR. FOSTER:  Mr. Jackson.

3          MR. JACKSON:  I will, Your Honor.  Mr. Foster is here

4  as an expert on RICO.

5          THE COURT:  Mr. Jackson, I have an awful lot of

6  questions about what's going on here.  It's really hard to

7  figure out exactly what this is.  As I understand it, you claim

8  that you have an agreement with Mr. Altman and his firm, some

9  kind of agreement, but there's nothing in writing; is that

10 correct?

11         MR. JACKSON:  Your Honor, the contract itself was a

12 verbal contract, however, there is written evidence of it in

13 the form of emails that reference bank transfers that comport

14 with the terms of that agreement and documents from the

15 defendant's firm referencing the fee split and other things.

16         THE COURT:  Did you supply those to the court as part

17 of your application?

18         MR. JACKSON:  No, Your Honor.  Those are not exhibits

19 to the complaint.

20         THE COURT:  Well, look, I want to make sure we're all

21 talking about the same case.

22         You filled out a civil cover sheet when you filed

23 this, correct?

24         MR. JACKSON:  I was not the one -- I believe it was

25 filled out.  I was not the one who personally filled out the

1  cover sheet.

2        THE COURT:  Did you sign it?  Is that your signature?

3  Is that what you're saying?

4        MR. JACKSON:  Yes, I reviewed everything; I didn't

5  draft it.

6        THE COURT:  I asked if you signed it.

7        MR. JACKSON:  Yes.

8        THE COURT:  It looks like your signature.  It looks

9  like the same signature that's on the complaint, right?

10       MR. JACKSON:  That's right.

11       THE COURT:  Well, there's a -- and we ask this

12 information so we can figure out who to assign this case to for

13 statistical reporting purposes, but we asked you in paragraph 6

14 the cause of action, you wrote in "police brutality matter by

15 New Jersey state troopers."

16       What's that got to do with this case?

17       MR. JACKSON:  Nothing, Your Honor.  That is an

18 oversight that I missed upon review of everything.

19       THE COURT:  Well, and we also in paragraph 8 ask about

20 related cases, and that's important here because in your papers

21 you indicate that the defendants claim they were going to sue

22 you.

23       But anyway, there's a spot down there and next to the

24 word "judge" is your signature.  Are you a judge?

25       MR. JACKSON:  No, Your Honor.

1          THE COURT:  Why did you sign where it says "judge"?

2          MR. JACKSON:  That was a mistake, Your Honor.  I

3  apologize.

4          THE COURT:  Well, how do you make that kind of

5  mistake?  The word "judge" is pretty easy to interpret, isn't

6  it?

7          MR. JACKSON:  The mistake was made because we were

8  staying up until 3:00 or 4:00 in the morning drafting papers.

9          THE COURT:  This relationship you have with Mr. Altman

10  and his firm didn't spring out of nowhere.  There had to have

11  been some period of discussions with Mr. Altman about getting

12  together on these cases, correct?

13          MR. JACKSON:  Correct.

14          THE COURT:  When did that begin?

15          MR. JACKSON:  I believe the discussions -- I mean,

16  Mr. Lento is here to help with the questions, but I believe the

17  discussions began in early 2020, as far as the cooperative fee

18  sharing.

19          THE COURT:  When did you first actually start sharing

20  fees with Mr. Altman and/or his firm?

21          MR. JACKSON:  I'd like to let Mr. Lento answer that,

22  if you'll allow it, Your Honor.

23          THE COURT:  Well, if he wants to be a witness.

24          Mr. Lento, do you want to be a witness?

25          MR. LENTO:  I can speak to those matters, Your Honor.

1          THE COURT:  Raise your right hand.

2              (**JOSEPH LENTO,** HAVING BEEN DULY SWORN OR DULY

3    AFFIRMED, TESTIFIED AS FOLLOWS:)

4    (DIRECT EXAMINATION OF JOSEPH LENTO BY THE COURT:)

5          THE COURT:  All right.  When do you claim that this

6    fee-sharing arrangement actually began?

7          THE WITNESS:  It would have been in the spring of

8    2020.  Mr. Altman and I started working on cases preliminarily

9    in or about March of 2020, through that spring and summer.

10   Business picked up respectively in August of 2020.

11         THE COURT:  How did you -- talk to me about what kind

12   of cases these are.  I'm not really clear as to what this --

13   what's going on here.  What are these cases?  Are these cases

14   that are pending in courts?

15         THE WITNESS:  Some are, Your Honor.  I would say just

16   anecdotally, 95 percent of them are not court matters.  This is

17   helping, say, mostly college students and higher education

18   students and similar others in academia, some K to 12, with

19   school-related issues and concerns of various sorts.

20         For example, if a student were to be accused of

21   Title IX sexual misconduct at college, that would be an example

22   of a case, academic misconduct.  Most any like school-related

23   issue or concern.  There are some litigation school-related

24   cases and there are some court-related cases of a traditional

25   stripe.  For example, Mr. Altman and I are involved in several

1   matters offhand, say, custody, divorce, protection from abuse

2   matters such as that.

3          THE COURT:  Tell me about the clients.  Are these high

4   school students?  College students?  What's the age range of

5   these clients?

6          THE WITNESS:  Sure.  It varies, Your Honor, but I

7   would say predominantly college students and up.

8          THE COURT:  And they contact you and they want to be

9   represented, apparently, because they're facing some

10  disciplinary action from their school, isn't it?

11         THE WITNESS:  Largely the case, Your Honor.

12         THE COURT:  And how do you get paid?

13         THE WITNESS:  In the sense of -- like technically in

14  terms of form of payment or -- I am sorry for asking.  I'm just

15  trying to --

16         THE COURT:  Who pays you?

17         THE WITNESS:  Well, it can vary.  I mean, often it is

18  a parent, sometimes it's a student him or herself, depending on

19  the age, of course, but most often it is a parent or family

20  member.

21         THE COURT:  And they pay you and your firm a retainer?

22         THE WITNESS:  Typically it's a flat fee for

23  representation, but, again, it depends on the nature of the

24  case.  Most of these cases are flat-fee cases, which the

25  representation generally would entail like a start to

1   conclusion involvement on our part generally at the school

2   level.  Because, again, that's what most of these cases are.

3   But then it varies also with those other cases, the -- there's

4   a respectable number, but in terms of overall percentages, the

5   vast majority, again anecdotally, maybe 90 percent, 85 percent

6   are at the school level.

7           THE COURT:  And do you enter into written fee

8   agreements with these clients?

9           THE WITNESS:  When the client would contact me, Your

10  Honor -- well, I mean, yes, that is supposed to take place.

11  When a client would contact me, initially it's for the purpose

12  of a consultation, a paid consultation, for which I have

13  charged $350.  I would charge the card.  That's how, you know,

14  a person would pay, credit or debit card, for example.  I would

15  send out a consultation and engagement letter detailing the

16  terms of the consultation.  Once the consultation would take

17  place at some period of time, then if they're moving forward

18  with -- for purposes of representation, a fee agreement should

19  go out.  That's a, you know, separate consideration.  But, yes,

20  a fee agreement would go out detailing the terms of the

21  representation for the case itself.

22          THE COURT:  So let's say that -- I'm making this up

23  because I don't have any knowledge of this -- that you come to

24  some fee agreement with a client for a thousand dollars, you do

25  whatever needs to be done to defend that person in whatever

1   this administrative proceeding is going to be or whatever the

2   school is trying to do, and they get a fee agreement, do they

3   pay you then or do they pay you when it's over?

4           THE WITNESS:  No, they pay to proceed, like for us to

5   start.

6           THE COURT:  And you deposit that money where?  In a

7   trust account?  In a business account?  Where does the money

8   go?

9           THE WITNESS:  Because it's a flat fee, it goes

10  basically into a business operating account.  Some of those

11  financial matters I would have to defer, but, I mean, it goes

12  into a basically operating account, not like an IOLTA account,

13  for example.

14          THE COURT:  How is the decision made as to what

15  Mr. Altman and his firm was going to do?

16          THE WITNESS:  How was that decision made?

17          THE COURT:  How do you make that decision?  Because

18  apparently, there's a number of cases that Mr. Altman and his

19  firm worked out, but they come in to see you, correct?

20          THE WITNESS:  When you say "come in to see me."  Like,

21  in other words, the potential client would contact me, they

22  would engage me for purposes of the consultation.  Like I said,

23  the consultation engagement letter would go out.

24          Mr. Altman and I started working together, like I was

25  saying, you know, March -- early 2020.  Business picked up

1  again August 2020.  Basically I would assign the case to

2  Mr. Altman, and he would handle the case.  He would be

3  basically the role of lead attorney on the case.  That's how

4  that would come about.

5          And the expectation on my part -- I was responsible

6  for many aspects of the business and practice and I had

7  Mr. Altman be responsible for other aspects of the business.

8          THE COURT:  Back up a minute.  So the client contacts

9  you, word of mouth, website, whatever it is, and you have a

10  consultation, and then you decide that Mr. Altman is going to

11  handle this case going forward, is that what you do?

12          THE WITNESS:  Basically.  Mr. Altman would -- like, he

13  would join the consultation call with me.  So it would be a

14  joint consultation.  And if the client were looking to proceed,

15  then, you know, the understanding would be on Mr. Altman's and

16  my part that Mr. Altman would be taking the lead on the case

17  and -- I mean, that's basically what would be taking place

18  there.

19          THE COURT:  Were there any clients for which

20  Mr. Altman's services were not used?

21          THE WITNESS:  Were there any clients -- sorry.  Could

22  you ask that again, please?

23          THE COURT:  You have these people contact you, they

24  want a consultation.  You just said that Mr. Altman would

25  participate in the consultation.

1           Were there any such contacts, clients, potential

2    clients that Mr. Altman did not get involved with?

3           THE WITNESS:  Yes.  In terms of like my overall

4    practice, yes, that would be correct.  Like, the Lento Law

5    Firm, anecdotally, most of the business is, I would say,

6    85 percent student-related cases.  So Mr. Altman was involved

7    in a very large share of the firm's practice.  There were some

8    other cases of a more traditional stripe, say, you know,

9    criminal defense, for example, family law, that either I or

10   others would be involved with.  Mr. Altman would not be

11   involved.  But then there were a small number of them also

12   where Mr. Altman, like, he was involved in those also.

13          But to answer your question directly, yes, there were

14   cases that came to the Lento Law Firm and me that Mr. Altman

15   was not involved with.

16          THE COURT:  All right.  So you've already booked the

17   fee, it's paid -- it's a fixed fee paid in advance.  When does

18   Mr. Altman get his share, whatever that share is supposed to

19   be?

20          THE WITNESS:  Sure.  Well, that's, in part, the issue.

21   I made regular and consistent and substantial payments to

22   Mr. Altman throughout our involvement.  Because the marketing

23   expenses would come off the top, there were a lot of

24   calculations that needed to be done.  And the marketing would

25   vary each month.  But basically -- I mean, I'd have to check

1   the exact dates.  I have records of all of that.  But

2   Mr. Altman was regularly paid in terms of -- we still have yet

3   to do final calculations, and there was delay on Mr. Altman's

4   part, despite my repeated requests over periods of time, to get

5   basically like his list -- he would have like a master list of

6   sorts and as would I have.  I would keep track of all payments

7   received, the clients' name, when the payment was made.  And

8   then in getting -- when it was supposed to be provided to me, I

9   would need Mr. Altman's list to cross-reference, and then my

10  accountant would be able to calculate the marketing expenses

11  and subtract that to the top so that 60/40 percent split, 60

12  percent to me, 40 percent to Mr. Altman, could be taken care

13  of.  Now, that percentage changed in January of 2022, but from

14  the start of us working together until January of 2022, that's

15  what that was.

16          THE COURT:  And how was Mr. Altman paid?  Did you send

17  him a check after each case?  Did you send him a quarterly

18  check?  Was it an electronic transfer?  How did you pay him?

19          THE WITNESS:  Sure.  By check, I believe, was how it

20  was paid every single time.  I'm not -- that's my understanding

21  of the matter.

22          THE COURT:  Well, was the check sent after each case

23  was closed, or was it a monthly, quarterly --

24          THE WITNESS:  No, it was regular.  It was regular.

25          Could you give me one moment, Your Honor?

```
 1              THE COURT:  Sure.

 2              THE WITNESS:  Thanks.  Sorry.

 3              MR. JACKSON:  While Mr. Lento is looking at that, I'll

 4    just add for context, in 2022, according to a document provided

 5    by Mr. Altman, Mr. Lento has paid his firm $780,000.  So the

 6    payments are coming in and they are significant.

 7              MR. ALTMAN:  Your Honor, I object to that

 8    representation that was just made.  This document that was sent

 9    to counsel was marked as for settlement purposes only.  For him

10    to have disclosed that in this context is totally

11    inappropriate.

12              THE COURT:  Well, that's not a big deal.  I don't

13    really care what the numbers are.  I just want -- I care what

14    the process is.  I'm trying to figure out the process here.

15              THE WITNESS:  Sure, Your Honor.  Well, basically in

16    looking at my -- my mother is my bookkeeper, and she would be

17    responsible for making the payments, which in looking at the

18    sheet that my mother prepared, were checks sent.  I have

19    specific dates and amounts.  Basically I paid Mr. Altman as

20    the -- for lack of a better way to put it -- the money was

21    coming in, to try to get him his payments as regularly as

22    possible, and in getting his payments to him as regularly as

23    possible -- but unfortunately, like, again, calculations have

24    to be done, there was delay on Mr. Altman's part in terms of

25    being able to provide certain information for me to be able to
```

1  finalize the numbers.

2         I'd have to confirm, but in -- we finally got

3  information, I believe yesterday, from Mr. Altman that I've

4  been waiting on for a significant amount of time to be able to

5  try to come to a final number here.  And my accountant, as of

6  late last night, I provided him the information provided by

7  Mr. Altman.  He's going through the numbers.  I'm not a numbers

8  person, to be frank.  But basically he was getting regular

9  payments.

10        Just to give a brief example, 2020 was -- the numbers

11 were smaller.  The advertising span was less and so forth.  I

12 changed certain things January of 2021, and the volume and

13 number of leads came in -- like, increased significantly.

14        But just for example, January 2021, $20,000 check --

15 January 15th, 2021, that is, $20,000 check; February 1st, 2021,

16 $20,000 check; February 8th, 2021 --

17        THE COURT:  Mr. Lento, go a little slower.

18        THE WITNESS:  Sorry.  Basically like substantial

19 payments to try to get the money that would be due to

20 Mr. Altman to him until a, you know, final calculation could be

21 done.  But, again, because the marketing varied every month,

22 you know, that was the circumstance.

23        THE COURT:  When you sent the check, did you send an

24 accounting as to what the check represented?

25        THE WITNESS:  That's basically what I'm saying.  Like,

1   the money he was getting really wasn't for a particular case in

2   a sense.  I was just trying to get him money and was getting

3   him money, but without a final reconciliation for, like, the

4   amount that was owed.  And just -- the day-to-day -- my

5   responsibilities on a day-to-day basis were what they were and

6   the expectation was whether he owed me money or I owed him

7   money or we're fair and square, that would be addressed at a

8   point in time.  And I'd have to confirm with my accountant and

9   my bookkeeper, but I believe we would be settled up through

10  September of 2021, but I'd have to confirm that.

11          THE COURT:  You never provided a written accounting of

12  what the money represented, is that what you're saying?

13          THE WITNESS:  A written accounting of what the money

14  represented?  No -- I mean, that would be fair to say for the

15  simple fact that he was just getting these lump sum payments

16  which, again, the calculation was going to be done at a point

17  in time.  But, yes, I didn't send a check with like cases X, Y

18  and Z -- like this is payment for X, Y and Z, that did not take

19  place.

20          THE COURT:  So you're sending -- you're splitting your

21  fee with someone who's not a New Jersey lawyer, correct?

22          THE WITNESS:  He's not a New Jersey attorney, that

23  would be correct.

24          THE COURT:  Did any of these cases involve courts in

25  New Jersey?

1            THE WITNESS:  I do not believe any involved courts in

2    New Jersey, unless they would be for litigation purposes,

3    which, offhand, I don't think there were any.

4            THE COURT:  Did any involve disputes from New Jersey

5    colleges, universities, schools?

6            THE WITNESS:  Yes, Your Honor.

7            THE COURT:  With Mr. Altman working on those?

8            THE WITNESS:  That's correct, Your Honor.

9            THE COURT:  To your knowledge, have you been sued by

10   Mr. Altman for this money?

11           THE WITNESS:  Not that I know of, Your Honor.

12           THE COURT:  In the litigated cases that actually were

13   in court, who was counsel of record?

14           THE WITNESS:  I believe Mr. Altman was the one who

15   entered his appearance on those, but the -- I am sorry.  The

16   litigated cases -- I'd have to distinguish, Your Honor, please.

17   There are like lawsuit-type cases against schools and

18   potentially others, but most would be schools, my understanding

19   would be Mr. Altman entered his appearance.  But for, like,

20   example, a court case where -- a more traditional sort.

21   Custody, for example, then I would be the attorney of record

22   and Mr. Altman pro haced in on several of those cases.

23           THE COURT:  So even in the non-student disciplinary

24   matters, Mr. Altman was called upon to do work in some of the

25   cases that you originated, is that what you're saying here?

```
 1            THE WITNESS:  Yes, Your Honor.
 2            THE COURT:  There's some -- apparently some issue
 3   about a hundred files, which I don't understand.  And that's
 4   apparently the point of your application for preliminary
 5   restraints, something about a bunch of files.  What's that all
 6   about?
 7            THE WITNESS:  Yes, Your Honor.  Your Honor, not this
 8   past Sunday, the Sunday before, it got to the point where I
 9   understood the relationship was not going to work any further,
10   so he and I -- Mr. Altman and I got on the phone, my father was
11   present, there's a conversation about us going our separate
12   ways.  I said -- and this is not necessarily in any particular
13   order, but I said, you know, I want to settle up, get me your
14   list.  Mr. Altman said, you know, I've been waiting for that
15   for months, I've been -- that's what he said to me.  And I
16   said, I've been waiting for your list for months.
17            Like, in part, for example, end of 2021, for the sake
18   of brief discussion, just assuming, let's say, October,
19   November, December of 2021 weren't settled up, in early 2022, I
20   had said to Mr. Altman get me your list, I want to -- I want to
21   account for the end of 2021.
22            At some point in time -- this is early 2022 or so --
23   Mr. Altman says, Well, like, I don't want you to pay me now,
24   assuming that money's owed to him, because of my divorce.  And
25   I said, That's fine, I don't care about that, but I want your
```

1  list so that I can account for the end of 2021.

2         Moving forward into 2022, the cases were coming in

3  through July, this past month, last month, that is, 2022.  I

4  would have to double check, but it's close to $850,000 or so

5  approximately that I've paid Mr. Altman.  But it became clear

6  that despite my absolute best efforts, like, I could not remain

7  in this -- dysfunctional relationship is what it amounted to,

8  unfortunately.

9         THE COURT:  Mr. Lento, get to the files, the hundred

10  files.  I don't care about that.  Just the files, please.

11         THE WITNESS:  Sure.  I apologize, Your Honor.  The

12  files, those are the cases that Mr. Altman is working on that

13  when we spoke the Sunday before this past -- you know, there's

14  a dispute over the money and so forth.  You know, Mr. Altman

15  makes threats to me regarding certain matters.  And I said --

16  like, just to be more clear, Mr. Altman says, I'm going to tell

17  you how it's going to go.  Like, I'm going to go to war.

18  You're not going to have a firm left by the time I'm done.

19  You're going to have to -- I can't recall if he said you have

20  to wire me or get me $500,000 by Monday morning of last week by

21  9:00 a.m., otherwise I'm going to file a lawsuit and file a Bar

22  complaint and send an email to the 100 open cases telling these

23  clients that I'm stopping work on your cases because you

24  haven't paid me.

25         And I said, well, you know, I'd advise you not to do

1   that.  If you're not going to work on these cases, you need to

2   send them back to me.  And he said in response, No, you need to

3   pay me.  I said, That is not a matter at hand here.  That would

4   have to be decided otherwise, who owes who what, whether he

5   owes me money or I owe him money or we're even.  But I said,

6   You need to send me these cases back so that I can work on the

7   files.  You can't hold the clients hostage or prejudice them

8   because of any matters between he and I.

9        Those are the hundred files or so that are in various

10  stages of work.  Some are dormant, some are active/active, some

11  are in between, some of these cases -- these cases tend not to

12  resolve themselves overnight.  It could be weeks, months,

13  sometimes some of these are lasting for more than a year.

14       THE COURT:  So let me make sure I understand this.

15  Your understanding is that there's a hundred clients out there.

16  You originated the case, opened the file, gave it to

17  Mr. Altman.  Mr. Altman now has the file and you believe now

18  has the relationship with that hundred clients; is that

19  correct?

20       THE WITNESS:  Overall that would be correct with, you

21  know, further explanation to, you know, describe that.  But,

22  yes, that would be correct.  He has the files, access to the

23  files, access to what's going on with the cases and so forth.

24       THE COURT:  And you're -- your fear is that he's not

25  doing anything on these cases and these clients have been cast

1    adrift, is that what your fear is?

2          THE WITNESS:  That's one fear, yes, especially because

3    that was threatened, again, Sunday of last week.  In some

4    correspondence going back and forth, I see some work taking

5    place.  But, yeah, that is my fear.

6          THE COURT:  Of course the file doesn't belong to

7    either one of you, it belongs to the client.  The client can go

8    anywhere he or she wants to go.

9          You all understand that, I assume?  Right, Mr. Lento,

10   you understand that?

11         THE WITNESS:  That makes sense, Your Honor.

12         THE COURT:  These payments, whatever they were, that

13   you made from Mr. Altman and/or his firm over the years for

14   whatever amount it is, how did you treat them for tax purposes?

15         THE WITNESS:  I'd have to defer to my accountant and

16   my mother.  I believe it was a 1099, but I don't get into the

17   numbers and those aspects of the matter.  I am sorry, Your

18   Honor.

19         THE COURT:  All right.  Mr. Altman, did you want to

20   ask any questions of the witness on these issues?

21   (CROSS-EXAMINATION OF JOSEPH LENTO BY MR. ALTMAN:)

22   Q.   Mr. Lento, you claim that there was an oral agreement for

23   a non-compete, correct?

24   A.   That's correct.

25   Q.   What are the terms of that non-compete agreement?

A.   To do just that, not compete.

Q.   Was there a time duration of that agreement?

A.   Was there a time duration?  Your and I -- your and my

relationship was established with really no end in sight.  My

hope was that you and I could continue to work together

productively but, unfortunately, that didn't take place.  So I

went into this with good faith and went through this with good

faith but, you know, I see the opposite having taken place on

your part.

     So, unfortunately, me going into this relationship and

expecting to do this until I retired, the -- to answer your

question, there may not have been for the simple fact that I

thought you and I would be working together indefinitely, until

you died or I died or whatever the case may be.

Q.   I'm asking very -- I'm not talking about our relationship

generally, I'm talking about the non-compete agreement that you

claim exists.

     Was there any time duration of that agreement?

A.   Again, just as I said -- just as I said.

Q.   Was there any scope in terms of geographic location?

A.   Yes.  I mean, the understanding would be that -- like, I

brought -- the understanding would be that I would bring all

student cases to the table and share with you.  You, obviously,

handled certain cases of your own on your end, as did I, to a

limited extent for the simple fact that the student cases

1   account for about, again, anecdotally, 85 percent of my

2   practice or so, 90 percent even.  So, yes, the understanding

3   would be that you wouldn't be handling student cases on your

4   own.

5   Q.   So you're saying "the understanding."  Was there ever a

6   specific agreement where you specifically set forth the terms

7   of the non-compete?

8   A.   Yes.

9   Q.   Okay.  And what were the specific terms of the

10  non-compete?  Was it just that simply for the rest of time,

11  forever, no matter what, you wouldn't compete on student

12  discipline, is that what you're saying?

13  A.   What I'm saying is that you and I would share in the

14  student cases.

15  Q.   And so are you saying that even if you terminated the

16  relationship, that non-compete still persisted?

17  A.   Even if I terminate the relationship?  Unfortunately, you

18  forced this relationship to end.

19  Q.   I'm asking you the terms of the agreement.  I'm not asking

20  about what happened.

21  A.   Sure.

22  Q.   Is it your testimony that this non-compete would persist

23  even if there was a termination of the relationship?

24  A.   Well, let's see.  Your -- you completely changed the

25  understanding of the relationship and agreement by actions that

1   you took through the course, unfortunately.  So, yes, the

2   expectation would be that you would not be handling student

3   cases on your own.

4   Q.   That's not my question, Mr. Lento.  Let's try for the

5   third time.

6        Is it your testimony that the nature of the agreement was

7   that if the relationship was terminated by you, that I would

8   still be precluded from competing against you?

9   A.   That wasn't actually a conversation that was had, if the

10  relationship was terminated by you.  If you're asking me if you

11  and I had a conversation where it was discussed what would

12  happen if the relationship was terminated by Mr. Lento, like,

13  no, that wasn't a conversation that was had.

14  Q.   Was there ever a discussion as to whether there was a

15  non-compete in spite of termination by anyone?

16  A.   Again, the expectation was that you and I would be working

17  together indefinitely.

18  Q.   Now, on the consultation calls, isn't it true that you

19  basically didn't say anything on the consultations and that I

20  did the consultation and virtually 98 percent of the talking

21  after you introduced me?

22  A.   At times -- well, just to be more fair in that regard, and

23  something that I've explained to you about a thousand times,

24  for every one consultation that I served piping hot to you, I

25  would have to speak to approximately a hundred people and get

1   beat up on the phone.  So, you know, I understand that you

2   think you're the best closer in the world, but, like, yes, you

3   would largely talk on the phone, nothing against anything, but,

4   you know, these cases are basically presold and preclosed.

5   Q.   Mr. Lento, I just want to be clear because you brought it

6   in.  I'm not talking about anything beforehand.  When you

7   brought me in on a consultation, isn't it true that I did about

8   98 percent of the talking after you did the introduction in

9   terms of laying out -- understanding the issues and effectively

10  selling them on the project.  Correct?

11  A.   After I taught you what you needed to know about student

12  and educational cases, as you had never done one before you met

13  me.

14  Q.   Is that a yes, Mr. Lento?

15  A.   You would do most of the talking, and I would always be

16  present and/or tending to other matters.

17  Q.   I would do the vast bulk of the talking, not just most of

18  the talking, correct?

19  A.   You would do most of the talking.

20  Q.   I would do the vast bulk of the talking, correct?

21  A.   You would do -- the vast bulk of the talking?  You like to

22  talk so, yeah, that would be a fair statement.

23  Q.   Okay.  Now, isn't it true that you had records of all of

24  the cases that you had sent over to me?

25  A.   Isn't it true that -- okay.  I keep --

1  Q.   Strike that.  Bad question.  Isn't it true that you had

2  records of all the payments you received for all the cases that

3  you sent over to me, correct?

4  A.   Isn't it true that I have records of all of the cases --

5  say that again, please?

6  Q.   Isn't it true that you had records of the payments

7  received for all of the cases you sent over to me?

8  A.   I keep records of payments received.  I did not

9  distinguish on my master list which cases were student cases

10 and which cases were not student cases although, again,

11 anecdotally, 85 to 90 percent were student cases.

12 Q.   So are you saying to this Court that you don't have

13 records of what cases you sent to me and the payments you

14 received?

15 A.   No, I have records of the cases.  I needed your master

16 list of the cases that you had -- that you had handled.  Prior

17 list that you had sent over, I always had to cross-reference

18 because of the simple fact that prior lists skewed in your

19 favor, whether intentionally or by mistake, but dollar amounts

20 skewed in your favor, so I had to double check on my end

21 regarding actual -- well, what you believe to be what was paid

22 versus what actually was paid.

23 Q.   So when you say "skewed," those could be just simple

24 mistakes, you don't know one way or the other, correct?

25 A.   I just said that.  I just said that.

1   Q.   Okay.

2   A.   But it was a respectable amount, which was concerning to

3   me.

4   Q.   Respectable amount.  Did you ever point out the fact that

5   there may be some errors?

6   A.   Did I ever -- say that again, please?

7   Q.   Did you ever point out the fact that there might be some

8   errors in the list that you received?

9   A.   I pointed it out to my accountant and my parents and

10  others.

11  Q.   Did you ever point it out to me?

12  A.   I don't know if I had that conversation with you for the

13  simple fact that, like -- well, you wouldn't have been

14  receptive to that either way.  So, like, the reality of what it

15  was, was it would have to be put in black and white for you.

16  Q.   I'm not understanding you.  If I put down that we were

17  paid $10,000 and we were paid 7,500, why wouldn't you just say,

18  hey, this is not correct, here's the payments?

19  A.   That was or would take place.  That's what I -- we were

20  trying to have a final accounting.  And this is from reference

21  when I was settling up last summer around -- whatever that may

22  have been, August, September or so, when you sent me over a

23  list -- I have handwritten notes on it which you showed the

24  actual payments made versus what you claim to have been the

25  payments.  And, again, I mentioned it to His Honor, but we

1   settled up, I believe, around September of 2021 or so.

2   Q.   Have you ever provided me any of the marketing numbers?

3   A.   I told you what the marketing numbers were at times.

4   Q.   Have you ever -- and I've asked you to provide me some

5   documentation to associate with the marketing that you wanted

6   to deduct off the top, right?

7   A.   Not wanted to deduct.  That was the agreement.

8   Q.   Fine.  I asked you --

9   A.   Again, only recently, like, was that asked.

10  Q.   So are you saying that in -- we didn't have a dispute in

11  approximately November where I've asked you for a copy of the

12  marketing expenses, which you refuse to provide to me that --

13  are you saying that's -- let me ask it this way, have you ever

14  provided me any records other than your oral statements --

15  which you say you're not good with numbers.  Have you ever

16  provided me any written records of the marketing expenses

17  associated with this endeavor?

18  A.   Well, my accountant is good with numbers and my mother is

19  good with numbers also.  You're not -- at a prior point in time

20  and, you know, until this day -- and I defer to the Honorable

21  Court, but you weren't entitled to the marketing numbers.  The

22  marketing numbers are the marketing numbers.  Like, those --

23          THE COURT:  Excuse me.  Excuse me.

24          MR. ALTMAN:  I am sorry.

25          THE COURT:  Mr. Lento, is your answer no, you never --

1          THE WITNESS:  I am sorry.

2          THE COURT:  Is your answer that you never provided the

3    marketing numbers to Mr. Altman?  Is that correct?

4          THE WITNESS:  The marketing numbers were verbally

5    provided to Mr. Altman at times through the course of the

6    representation.  I don't believe he received any records in

7    that regard.

8          THE COURT:  Thank you.

9    BY MR. ALTMAN:

10   Q.   Now, the money that my firm was supposed to be paid, was

11   it part dependent upon these marketing numbers, correct?

12   A.   That's correct, yes.

13   Q.   So why would I not have been entitled to see the marketing

14   numbers if you're going to pay me based on those marketing

15   numbers?

16   A.   There's no question as to that until you started making

17   these unreasonable demands with respect to your payroll, and

18   then that only came about more recently, say as recently as May

19   or so of 2022, when it was first -- or when it was discussed

20   that you would -- you were making demands.  You contacted me on

21   a Saturday afternoon saying it's basically imperative that we

22   speak the next day.  I didn't want that weighing on me, because

23   every time you got me on the phone it was one demand after the

24   other, so we spoke around -- I don't know, Saturday afternoon.

25   This was, I believe, May of 2022, where it went from -- well,

1   it actually went from maybe a year and a half or so back.  Joe,

2   I'm trying to fund my own law practice, how about you pay me

3   $30,000 a month, and then when things are going well in about a

4   year, like, you can share in the cases that I'm working on.  I

5   said, you know, sounds maybe good in theory, but that's not

6   something that I can do just based on the circumstances, my

7   financial circumstances.

8       Fast forward to -- yes, we did have a dispute in or about

9   October, November 2021 or so.  January 2022, you propose two

10  arrangements going forward, one basically with the percentage

11  split, continuing to take the marketing expenses off the top

12  with you getting a greater share, or the other option being you

13  taking into account your operating expenses and my marketing

14  expenses off the top and keeping the percentage split as it

15  was, the 60/40.

16      There was a discussion on our end that there's no way that

17  we can be -- depend on you to be reasonable in your spending.

18  And that went from $50,000 suggested on your end in operating

19  expenses in January of 2022 to, only four months later,

20  $130,000 that you were seeking in May of 2022, to basically

21  $165,000 this past July.

22      And at that point, like despite me trying to make that

23  work, because I -- despite me trying to make that work, it

24  became obvious that it was just not viable.

25  Q.   Now, you would agree that you knew that this was not me

1    doing all of this work, correct?

2    A.   Yes, that would be correct.  The arrangement as it was --

3    and I cautioned you about this September or so of 2021, that

4    you were complaining about me not -- you not being able to pay

5    people that you had hired.  I'd have to reference back, but I

6    believe possibly about maybe $30,000 a month or so.

7         And I cautioned.  I said, you know, it's disconnected that

8    you're complaining about not being able to pay people that you

9    hired to do the work that I'm paying you to do.  So, like, yes,

10   I know you brought people on to do that.

11   Q.   Well, Joe -- sorry.  Mr. Lento, you're aware that in 2022

12   we closed approximately 200 projects, correct?

13   A.   2022 -- I'd have to check that.

14   Q.   I'll represent to you it's about 200.  You didn't think

15   that any one person could possibly handle 200 matters by

16   themselves, correct?

17   A.   And, again, that's why I tried to make it work but, you

18   know, recognize that this -- it was not going to work any

19   longer.

20   Q.   But that's not the point here.  You were fully aware

21   through this entire process that I had multiple people working

22   to provide the services that allowed you to increase your

23   sales, correct?

24   A.   That allowed me to increase my sales?  No, I would say

25   that they're not actually one in the same.  I know you had

1   people working for you.

2   Q.   Okay.  But it increased -- you would agree that the sales

3   increased tremendously between 2021 and 2022, right?

4   A.   Thanks to my marketing efforts and ingenuity and

5   strategies and financing of that, not because of anything --

6   not because of anything that -- like, you're not on the front

7   end.

8   Q.   I see.  So actually being able to close the projects,

9   which I did --

10  A.   Okay.  And I would --

11  Q.   And --

12  A.   I would dispute that.

13         THE COURT:  Time -- gentlemen, you can't talk over

14  each other.

15         MR. ALTMAN:  Let me ask another question.

16         THE COURT:  Hang on, Mr. Altman.  This is just about

17  the TRO.  This dispute you have about the money is really not

18  what this TRO preliminary injunction hearing is all about.

19         Let's get back to the issues that you want to raise in

20  this hearing.

21         MR. ALTMAN:  Okay.

22  BY MR. ALTMAN:

23  Q.   Now, Mr. Lento, just last week we negotiated a resolution

24  agreement, didn't we?

25  A.   No.  Negotiations were taking place, but we did not

1   negotiate a resolution agreement.

2   Q.   You didn't provide to me a writing that represented what

3   the resolution agreement was, that didn't come from you?

4   A.   If you're trying to say that that was agreed upon, you're

5   out of your mind, respectfully, for the simple fact that my

6   concern is -- my concern is with these cases I'm already

7   dealing with approximately 25 to $40,000 in chargebacks or

8   refunds for clients who -- cases are either not being attended

9   to or they're not pleas, for whatever reason that, as things

10  stand, I would be on the hook for, and that was a big part or a

11  big concern of going our separate ways.

12      You wanted to walk away with as much as possible, you

13  know, despite having been paid for the work and me being left

14  with the short end of the stick.  I'm trying to do what's right

15  here, like I've been doing all along.

16  Q.   Mr. Lento, can you please answer my question.

17          THE COURT:  Gentlemen, you can't keep talking over

18  each other.

19          MR. ALTMAN:  Your Honor, I asked him simply did he

20  provide a writing last week.

21          THE COURT:  Mr. Altman, I advise you, you shouldn't

22  interrupt me either.

23          MR. ALTMAN:  I am sorry, Your Honor.  It's the video

24  is clipping.  I apologize.

25          THE COURT:  Everybody calm down, all right.  You have

1   plenty of time to dispute this money difference that you have

2   between you.  There are finite issues here.  There's a limited

3   injunction that the plaintiff seeks.  Let's focus on those

4   issues contained in that specific request for this specific

5   temporary preliminary injunction.

6            MR. ALTMAN:  Okay, Your Honor.  I just need to raise

7   up about, you know, the settlement agreement that was -- I

8   thought was in place is relevant here because I believe this

9   matter has been settled.

10           THE COURT:  Well, he denies there's a settlement.  How

11  am I supposed to decide that today?

12           MR. ALTMAN:  Can I just ask a couple of questions?

13  BY MR. ALTMAN:

14  Q.  Mr. Lento, did you send me a writing last week

15  representing the terms of a resolution agreement?

16           MR. JACKSON:  Objection.

17           THE WITNESS:  Anything that was -- sorry, Sam.  I

18  think there's an objection, Your Honor.

19           MR. JACKSON:  The Court just limited these questions

20  to the issues relevant, which are the terms of our request for

21  these preliminary injunctions.  Whether or not there's an

22  agreement, as the Judge just pointed out, is an issue of fact

23  that can be litigated later.

24           MR. ALTMAN:  Well, Your Honor, it is relevant, in

25  fact, because he's trying to enforce an injunction to get us to

1    continue working on the matters, when we have settlement

2    agreement that says he's going to take the matters back.

3            THE COURT:  Well, why don't we ask him.  Mr. Lento, do

4    you want the matters back?

5            THE WITNESS:  Your Honor, please allow me a brief

6    moment.  What I believe would be fair -- and obviously, I defer

7    to the Honorable Court, is that, you know, Mr. Altman has been

8    paid, we're doing -- you know, we're able to do an accounting

9    now in terms of who owes who what, if I owe him money or he

10   owes me money or if we're fair and square.

11           That being said, like, Mr. Altman should continue, in

12   my respectful opinion, to service the clients until I am in a

13   position to be able to take them back to continue forward with

14   them.  That's my most immediate concern.

15           So do I want them back, Your Honor?  I could make

16   arguments either way.  My main concern is seeing that the

17   clients are serviced.  I don't know what Mr. Altman's

18   intentions are or -- I don't know what his intentions are.  And

19   based on the threats that I've been experiencing, you know,

20   this past week and a half and throughout the past year or so in

21   various capacities, tempered at times and direct at times, I

22   just want to make sure that the clients are serviced.

23           So, yes, do I want them back.  Am I in a position to

24   be able to take them back at the immediate moment?  Possibly.

25   I'd have to defer to my team.  I just don't know.

1   BY MR. ALTMAN:

2   Q.   Mr. Lento, if I continue with the cases, are you prepared

3   to continue making payments so that I can pay the staff

4   necessary to service the clients?

5   A.   No.  I tried to make your $130,000 a month in June demand

6   work -- and also in July.  I don't go to the backyard and pick

7   the money off the money tree.  We would settle up as to what's

8   appropriate and what the agreement was.  And, you know, subject

9   to the Honorable Court, of course.

10  Q.   Mr. Lento, you're saying I should continue working on the

11  cases and --

12          THE COURT:  Mr. Altman, Mr. Altman, let me interrupt

13  you.  You have the files, right?

14          MR. ALTMAN:  Yes.

15          THE COURT:  And you consider them your clients?

16          MR. ALTMAN:  I consider them Joe's clients, and he can

17  take them or he can leave.  If he wants to take them back, we

18  will give them back to him.  If he wants us to work on them,

19  we're happy to do it, but he's got to continue to make

20  payments.

21          THE COURT:  Forget about the payments.  You have an

22  obligation to your client whether or not your client is paying

23  you, paying anybody.

24          Are these your clients, Mr. Altman, or not?  Yes or

25  no?

1          MR. ALTMAN:  They were joint clients.

2          THE COURT:  Are you going to abandon your clients?

3          MR. ALTMAN:  I'm not going to abandon anybody.

4          THE COURT:  All right.  So you're going to continue to

5   represent them to your utmost ability, correct?

6          MR. ALTMAN:  What happens when I run out of money,

7   Your Honor, and can't pay the people to staff?  What do I do?

8          THE COURT:  I don't know, Mr. Altman.  You took the

9   cases on.  I didn't.

10          MR. ALTMAN:  Okay, but --

11          THE COURT:  Mr. Altman, stop arguing with me.

12          MR. ALTMAN:  Sorry, Your Honor.

13          THE COURT:  That's a risk every lawyer takes when he

14   or she takes on clients, is the risk of non-payment.  That

15   doesn't excuse your ethical responsibility to continue to

16   represent them.

17          Your only choice at this point is to advise each and

18   every one of them that you no longer wish to represent them and

19   they should go get a new lawyer.  All right?  Either do that or

20   you represent them.  Do you understand?

21          MR. ALTMAN:  Yes, Your Honor, we will do that.

22          THE WITNESS:  Your Honor, I am sorry.  Can I mention

23   something?

24          THE COURT:  No.  You guys are fighting like a bunch of

25   children.  I hope you all understand that this case has

```
 1   actually zero jury appeal.  You take this case before a jury,

 2   and ten minutes after deliberations start they're going to find

 3   a way to make sure both of you lose.  People hate lawyers and

 4   this is why.

 5          Do you have any more questions for Mr. Lento,

 6   Mr. Altman?

 7          MR. ALTMAN:  May I have a moment, Your Honor?

 8          THE COURT:  Yes.

 9          (Brief pause.)

10   BY MR. ALTMAN:

11   Q.   What -- Mr. Lento, what irreparable harm would you suffer

12   if I advertise the student discipline cases and service them

13   myself?

14   A.   Well, you would be taking everything that I taught you and

15   using it for your own unfair advantage.

16   Q.   What did you teach me about -- how many Title IX hearings

17   have you done under the new rules?

18   A.   How many Title IX hearings have I done under the new

19   rules?

20   Q.   Have you done yourself?

21   A.   I'd have to check.

22   Q.   The answer is zero, isn't it?

23   A.   I don't know if it actually is zero.  There were some

24   cases that, as we started ramping up, that I was still working

25   on, so I would have to reference back.
```

```
 1        Not to take anything away -- well, you know, strike that.
 2   I know you hold yourself out to be an expert in this.  I taught
 3   you everything you know.
 4   Q.   Okay.  What did you teach me about Title IX hearings?
 5   A.   Anything that the nine-page Department of Education Title
 6   IX summary, you know, can teach anybody.
 7   Q.   So in other words, you didn't teach me anything about
 8   doing Title IX --
 9   A.   No, I did, because you would come to me regularly for
10   input and instruction when we first started working together
11   because, again, you had never done a student or Title IX case
12   or educational case or anything like that.
13   Q.   So, in other words, Mr. Lento, the work that my firm did
14   was worthless, the consultations that I did were worthless,
15   you're everything, right?
16   A.   No, that's not what I'm saying.
17        MR. JACKSON:  Your Honor, I just object to this entire
18   line of questioning.  We're getting way off track again.  This
19   is --
20        THE COURT:  Sustained.  Sustained.  Let's go.
21   BY MR. ALTMAN:
22   Q.   So in terms of -- so you're saying that irreparable harm
23   is that I might get student cases, that's irreparable harm to
24   you?
25   A.   You're basically -- you copied my website, you copied my
```

1  advertising, you copied my reviews, you solicited reviews that

2  are on your website for Lento Law Firm clients.  So, you know,

3  there's various considerations and concerns in that regard.

4  Q.  So you can sue me for money, which you've done.  That's

5  not irreparable harm, right?

6  A.  Well, I defer to the --

7          MR. JACKSON:  I object, Your Honor.  This line of

8  questioning is -- I mean, these are legal questions.  The case

9  law in our order to show cause already sets forth clearly that

10  indeterminate loss and these types of breach of non-compete

11  agreements are, as a matter of law, irreparable harm.  So this

12  entire line of questioning is, again, getting way off track.

13          THE COURT:  Mr. Jackson, I'll cut to the chase here.

14  There is no proof of a non-compete post-termination agreement

15  here.

16          MR. JACKSON:  Well, there's been no termination, Your

17  Honor.  At this point, that's still up in the air.

18          THE COURT:  You stopped paying him, didn't you?

19          THE WITNESS:  No, no.  I am sorry, Your Honor.  Like I

20  was saying, the final accounting is being done, so whoever owes

21  who -- I mean, if I owe Mr. Altman money, I would pay him; if

22  he owes me money, I would expect him to pay me.  Plus there's

23  those outstanding litigation cases which have yet to be

24  resolved.  I mean, it could take years.  So there's that

25  outstanding money.

 1            THE COURT:  But doesn't that make Mr. Altman's point?

 2            MR. JACKSON:  No.  Your Honor, there's --

 3            (Inaudible crosstalk.)

 4            MR. JACKSON:  -- for an injunction to require

 5  Mr. Altman to uphold his end of the bargain and represent these

 6  clients, so that would continue --

 7            THE COURT:  We just went through that, and I told him

 8  he had two cases, he continues to represent them or he tells

 9  them by letter, personal notice to any of them, that he's no

10  longer representing them and they have to get new counsel.

11  Simple as that.  That takes care of that problem.

12            THE WITNESS:  Your Honor, I ask, respectfully, may I

13  please make a point?

14            THE COURT:  I don't want you to argue with Mr. Altman

15  anymore.

16            THE WITNESS:  No, no, I'm not.  Your Honor, here's one

17  of my concerns.  Like, if there's -- Mr. Altman sent me over a

18  list of approximately 300-something -- 380 names or so.  About

19  180 of them or so, 200, it's not clear which cases are still

20  open and which cares are closed.

21            Now, some of the cases are so old that I can take my

22  best educated guess and check off who likely is closed just

23  based on the age of the case.  That being said, if there are a

24  hundred cases, as Mr. Altman threatened a week and a half ago,

25  if he tells them to get new counsel, these people have already

1  paid.  And on average, if it's a $10,000 fee, which that is on

2  average what it would be -- I mean, if a hundred people ask for

3  their money back, like, that puts me in an impossible position.

4       I mean, that's why I'm saying it would be better if we

5  took the cases back, which I'm willing to do, versus that, you

6  know, likely possibility.  I mean, people aren't going to be

7  happy either way, obviously, but -- they came to me, they came

8  to me for my name and my reputation, so I think they would be

9  sat -- despite the disruption, I think they would be satisfied

10  to some degree that they're coming back to me in that sense.

11  That's what I would ask.  I mean, just in light of that serious

12  concern.  That was my whole concern with like just how this

13  transition was going to take place.

14       THE COURT:  I don't care what financial repercussions

15  come from this problem that you two have.  That's your ethical

16  problem, not mine.

17       Neither one of you own these clients.  They get to

18  make the decision whether they want to continue with either one

19  of you guys.  You both -- probably both of you have the

20  obligation to tell them what's going on so they can make an

21  informed decision as to whether they want to continue with

22  either one of you.  Now, whether it cost you money, too bad.

23  That's your problem.  Work it out.

24       Mr. Jackson, let's go through these things.

25       MR. ALTMAN:  Your Honor, can I just ask him two more

1   questions that I think are very important?

2         THE COURT:  All right.

3   BY MR. ALTMAN:

4   Q.  Mr. Lento, didn't you tell me during our discussion on the

5   24th you were no longer sending me any further matters or

6   having me do consultations?

7   A.  On the -- well, actually my father said that to you, I

8   believe.

9   Q.  He said that on your behalf, correct?

10  A.  I don't know if he -- he said it to you.  That was a

11  dispute that arose between you and he.  I was as calm and

12  collected as I could be considering --

13  Q.  Have you sent me any consultations in the last

14  approximately two weeks?

15  A.  No.

16  Q.  And on the 21st, did I do a consultation with the Dobbs

17  family, I think, in which I closed and which they paid money?

18  A.  The Dobbs family?

19  Q.  Yes, I believe it was Dobbs, was on Thursday, the 21st?

20  A.  I'd have to check the date.  That case was closed and they

21  paid money.

22  Q.  They paid money, and you didn't send that case to us, did

23  you, and yet I did the consultation two times, right?

24  A.  Well, we were both on the consultation, and they hired me

25  for the consultation, and I had sent them a Lento Law Firm

1    consultation fee.

2    Q.   And how much did you speak during the consultation?

3    A.   How much did I speak during the consultation?

4    Q.   Correct, other than to say hello.

5         MR. JACKSON:  Objection.  We're getting way off track.

6    You asked for two more questions, and now we're getting back

7    into the money dispute.

8         MR. ALTMAN:  Okay.

9    BY MR. ALTMAN:

10   Q.   Nevertheless, the fact is that you're no longer sending me

11   cases, you're no longer having me do consultations, so,

12   therefore, you have terminated our relationship in terms of

13   going forward, correct?

14   A.   Yeah, I'm not looking to work with you anymore.

15   Q.   Okay.  So when you said before that you hadn't terminated

16   the relationship, that wasn't accurate, was it?

17   A.   Everything I said thus far has been accurate and

18   everything I say moving forward will be accurate.  I'm not

19   looking to work with you anymore.

20   Q.   So the relationship is terminated, correct?

21   A.   However you want to characterize that.

22        MR. ALTMAN:  Thank you, Your Honor.  I apologize for

23   some of these bickerings.

24        THE COURT:  Mr. Jackson, what evidence have you

25   presented to the Court that any of the defendants have

1   disparaged any of the plaintiffs?

2            MR. JACKSON:  Your Honor, Mr. Lento just -- are you

3   asking what evidence have we put forth that defendants have

4   disparaged the plaintiffs to any clients already or that they

5   will?

6            THE COURT:  What evidence has the plaintiff presented

7   to this Court that any defendant has disparaged any plaintiff?

8            MR. JACKSON:  Mr. Lento has testified that Mr. Altman

9   has threatened to send out emails to 100 clients telling them

10  that he was not able to pay.

11           THE COURT:  You want me to try it again?  I'll try it

12  again.  What evidence has the plaintiff presented that any

13  defendant has disparaged any plaintiff?

14           MR. JACKSON:  Our evidence is only that they are

15  planning to, so none so far.  I'm not aware of it.  I don't

16  know what the conversations Mr. Altman has had with the clients

17  at this point.  He threatened to do it last week.  I don't know

18  if he carried out that threat yet or not.

19           THE COURT:  Also, apparently you're making a claim

20  that the defendants are using the plaintiffs' intellectual

21  property; is that correct?

22           MR. JACKSON:  Yes, Your Honor.

23           THE COURT:  Do you have any registered marks or

24  anything?

25           MR. JACKSON:  No, Your Honor.  I'm referring to the

1  plaintiffs' copyright, which is intellectual property, whether

2  it's registered or not.

3          THE COURT:  It's not registered?

4          MR. JACKSON:  It's published on his website, but it's

5  not part of any federal registry, if that's what you're asking.

6          THE COURT:  So you're alleging a common law violation?

7          MR. JACKSON:  I'll defer to the Court as far as the

8  legal interpretation.

9          THE COURT:  It's not my case, Mr. Jackson.  It's your

10  case.  I'm asking you what your case is.

11          MR. JACKSON:  If common law is the appropriate

12  interpretation, then --

13          THE COURT:  I'm not saying it's appropriate or

14  inappropriate.  I'm asking you what your case is.

15          You're seeking relief.  You're seeking extraordinary

16  relief from the Court.  I'm asking you to make your case for

17  it.  Apparently you're not able to.  Okay.  We'll go to the

18  next point.

19          What provisions are you making for a bond?

20          MR. JACKSON:  I am sorry.  Say that again, please.

21          THE COURT:  What provisions are you making for a bond

22  to be posted?

23          MR. JACKSON:  That no such provisions have been made

24  yet.

25          THE COURT:  Why not?  What's your proposal?

```
 1          MR. JACKSON:  I'm not sure I understand the question.

 2          THE COURT:  Have you read Rule 65?

 3          MR. JACKSON:  Yes, Your Honor.

 4          THE COURT:  Bond is mandatory.  What's your proposal?

 5          MR. JACKSON:  I'll have to get back to the Court with

 6  that.  I don't have a proposal ready to present at this moment.

 7          THE COURT:  Why didn't you present one when you filed

 8  the motion?

 9          MR. JACKSON:  That was an oversight, Your Honor.  I

10  apologize.

11          THE COURT:  Violation of the rules is a pretty big

12  oversight, isn't it?  Well, look, the plaintiff has miserably

13  failed to present a case under Rule 65 for extraordinary relief

14  in this case.

15          MR. JACKSON:  Well, Your Honor, the main purpose of

16  this request for this relief is to prevent the defendant from

17  abandoning cases.  I know that you verbally ordered him not to

18  do so, but that is the essence of this.

19          My main concern is the protection of the clients here

20  and, you know, to ensure that, you know, irreparable harm is

21  not inflicted on Mr. Lento's reputation, as the defendant has

22  threatened to send out letters to the clients telling them he's

23  stopping working and it's Mr. Lento's fault for not paying.

24  Mr. Altman doesn't have a right to stop working on a case

25  because of a third-party dispute over money.
```

49

```
 1          THE COURT:  He doesn't have an ethical right to stop
 2   working on a case.
 3          MR. JACKSON:  Correct.
 4          THE COURT:  That's his bigger problem at this point.
 5   For both of you it's your bigger problem as to what you're
 6   going to do with these poor clients.
 7          MR. JACKSON:  Correct.  Which is why we're seeking
 8   this injunction to begin with.  I mean, allowing -- if
 9   Mr. Altman ceases work on all these cases, that would be an
10   ethical violation because it will hurt their cases, and he has
11   an obligation to continue with these cases.  He can't just stop
12   working, which is what he's threatened to do unless Mr. Lento
13   pays him half a million dollars.
14          I mean, that's the type of extortion and the type
15   of -- you know, the type of sabotage that the rules don't
16   permit and that's why we're asking this Court to intervene.
17          THE COURT:  I think I made it pretty clear that
18   neither one of you can stop working on your clients' cases
19   without their permission, and I've suggested things you need to
20   do on both sides.  There's no need for an injunction to do
21   that.
22          As to these money issues, there's an adequate remedy
23   of law here on both sides.  You can hash this out, God bless
24   you, who owes what to whom.  I am shocked, utterly shocked that
25   there's no real paperwork here, number one, evidencing of what
```

1   you think the agreement is; and number two, all this money,

2   hundreds of thousands of dollars flowing back and forth and

3   nobody seems to know who owes what to whom, which is ridiculous

4   in this day and age with lawyers, members of the Bar.

5          There's no non-compete agreement in force and effect

6   post termination.  Clearly the agreement has been terminated.

7   It doesn't matter by whom.  There is no agreement anymore.  And

8   neither -- and both sides did not reach an agreement as to what

9   was to happen after termination regarding non-compete.

10          Plaintiffs failed to make any claim as to any kind of

11   violation of their intellectual property rights.  So for all

12   that -- there's no provision for a bond being made, which is

13   mandatory.

14          So for all those reasons, the applications are denied.

15   And here's what we're going to do next since we still have this

16   ridiculous dispute.  You have until Monday at 5:00, Monday at

17   5:00 p.m. to agree on a mediator.  If that doesn't work,

18   Tuesday morning I'll appoint a mediator.  We're going to put

19   this into mediation and see if we can resolve this stupid fight

20   that you're having between and among each other.  All right?

21          MR. LENTO:  Yes, Your Honor.

22          THE COURT:  Thank you very much.

23          MR. ALTMAN:  Thank you, Your Honor.

24          (Matter adjourned at 11:47 a.m.)

25

1         - - - - - - - - - - - - - - - -

2

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    /S/ Sharon Ricci, RMR, CRR
     Official Court Reporter

7

8    August 4, 2022
          Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25