## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____

JOSEPH D. LENTO, ESQ., *et al.*,

        Plaintiffs,

        v.

KEITH ALTMAN, ESQ., *et al.*,

        Defendants.

_____

Civil No. 22-4840 (RBK/EAP)

**OPINION**

**KUGLER**, United States District Judge:

This matter comes before the Court on two Motions to Dismiss: (1) Defendant Richard Gill's and Defendant Ari Kresch's Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim (the "Gill and Kresch Motion") (ECF No. 26) and (2) Defendant Keith Altman, Esq.'s and Defendant the Law Office of Keith Altman, PLLC's (the "Altman Firm") Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim (the "Altman Motion") (ECF No. 27) (collectively, the "Motions"). For the reasons set forth below, the Court **GRANTS** the Gill and Kresch Motion (ECF No. 26) in full and dismisses them from the case. The Court further **GRANTS IN PART AND DENIES IN PART** the Altman Motion (ECF No. 27).

## I.    BACKGROUND

### A.    Factual Background

#### 1.    Lento's Allegations

This case represents a prime example of why attorneys should always memorialize their agreements in writing. Sometime in 2008, Plaintiff Joseph D. Lento, Esq. alleges he founded a

law firm that later became the Lento Law Firm, LLC ("LLF"). (ECF No. 17, the "Amended Complaint" at ¶ 18). As it pertains to this case, Lento and LLF apparently, at least in part, handle "student defense matters involving such things as academic misconduct, student code of conduct violations, and Title IX violations." (*Id.* at ¶¶ 20, 36).

According to Lento and LLF, sometime in or around March 2020, Lento and Altman met and agreed to share some of these cases. (*Id.* at ¶ 20). Lento and LLF claim that, per the agreement's terms, Lento would solicit cases and refer them to Altman to handle. (*Id.* at ¶¶ 20–21, 81). Plaintiffs claim that the agreement's fee sharing terms were: first, Lento and LLF would deduct their marketing expenses for the case from the total fee; then, Lento and Altman would split the remaining amount 60/40—sixty percent to Lento and forty percent to Altman. (*Id.* at ¶¶ 21–22, 81). Additionally, Altman and his firm allegedly agreed "not to advertise independently [or] solicit business for this type of case in competition with [LLF]." (*Id.* at ¶¶ 51, 81). The parties came to their agreement orally and do not appear to have ever memorialized it in writing. (*See id.* at ¶¶ 20–23, 81).

Beginning sometime in the Spring of 2021, though, the business relationship began to sour. Lento alleges that Altman "failed on more than one occasion to follow-up with clients' phone calls and emails[.]" (*Id.* at ¶ 27). This, Lento claims, led to Altman not handling matters in a timely fashion, clients becoming frustrated, and LLF issuing refunds. (*Id.*). Plaintiffs further allege that Altman and his firm failed to send out fee agreements to clients and would often only send the agreements after the clients had already paid. (*Id.* at ¶¶ 29–30). Sending out fee agreements to clients was apparently Altman's responsibility even though Lento maintains, per the agreement's terms, LLF alone could solicit clients, LLF would be the "progenitor" of all

client relationships, Lento was the attorney of record on all cases, and Altman was only meant to "take the lead on" cases associated to him by Lento and LLF. (*Id.* at ¶¶ 21, 23, 29, 51).

Then, in June 2021, Plaintiffs claim the wheels fell completely off the wagon. Around that time, they claim Altman threatened to leave their collaborative venture, stop working on any cases, and (for some unknown reason) stop paying his own employees if LLF did not pay him $200,000. (*Id.* at 41). Lento and LLF claim Altman made this demand even though he knew LLF did not owe him $200,000. (*Id.*). They also claim that Altman "discussed making these demands on [LLF] with Gill and Kresch and they approved of doing so." (*Id.*). Lento and LLF maintain only that (1) Gill is the Managing Director of the Altman Law Firm, and he "works closely" with Altman, (*id.* at ¶¶ 38, 64); and (2) Kresch "also works closely" with Altman, (*id.* at ¶¶ 39, 65). Plaintiffs make no further allegations about those discussions' contents, i.e., how, when, or where they took place, or why Altman would involve Gill or Kresch in these plans. Lento apparently agreed to pay the $200,000 out of a fear that failing to do so would hurt LLF's business. (*Id.* at ¶ 41).

After this alleged payment, all parties appear to have worked in harmony until about five months later, in November 2021. (*Id.* at ¶ 42). At this point, Lento and LLF claim that Altman, Gill, and Kresch again demanded payment or else Altman would cease work on all cases and sue LLF. (*Id.*). This time Plaintiffs claim Altman demanded $365,000. (*Id.*). Lento claims he paid $200,000 again because he was afraid LLF would lose business if he did not. (*Id.*).

In February 2022 or thereabout, Lento and LLF claim Altman and company tried to alter the oral fee sharing agreement by once again threatening to stop work. (*Id.* at ¶ 43). As a result, Lento and LLF apparently agreed to change the agreement to 55/45, still in Lento's favor, and Altman would also now receive twenty-five percent of the consultation fees for cases. (*Id.*).

Next, in May 2022, Plaintiffs claim Altman and his alleged conspirators demanded an additional $130,000 per month or else Altman would stop working on all his cases and, for reasons unmentioned and beyond this Court, he would lay off his own firm's employees. (*Id.* at ¶ 44). Lento claims he agreed to pay the $130,000 per month starting in June 2022. (*Id.*).

Then things escalated. In July 2022, Lento and LLF claim Altman once again threatened to stop work, now in exchange for a $165,000 monthly payment. (*Id.* at ¶ 45). But this time, Lento apparently refused. (*Id.*). Perhaps in response to this refusal, Lento and LLF claim that on July 24, 2022, Altman demanded Lento pay him $500,000 within twenty-four hours or else Altman would file a state bar complaint against Lento and inform all their clients that he must stop working on their cases because Lento would not pay him. (*Id.* at ¶ 46). Lento allegedly refused. (*Id.*). Plaintiffs claim that after this refusal, Altman "ceased performance[,]" stopped all work on student defense matters, and will not turn over the files for those cases. (*Id.* at ¶¶ 4, 90, 100).

In addition to the alleged monetary demands, Lento and LLF allege Altman and his firm violated the advertising and non-solicitation provisions of their oral agreement. Plaintiffs claim the Altman Firm unveiled a new website in October 2021 that advertised for student defense and Title IX matters. (*Id.* at ¶ 52). The Altman Firm allegedly did the same on July 24, 2022, the same day Altman purportedly made his $500,000 demand. (*Id.* at ¶ 53). Plaintiffs further allege the new Altman site "copied" LLF's website by "paraphrasing each section." (*Id.* at ¶ 54). They then allege that Altman, with the apparent approval of Gill and Kresch, posted "Pay Per Click ads on Google which use the Lento Law Firm name . . . but direct web traffic to the Altman Firm." (*Id.* at ¶ 56). Plaintiffs attach images that purport to show this. (*Id.*). Lento and LLF further claim these ads are still up and running. (*Id.* at ¶ 57). They have apparently requested

4

Altman and his firm take the ads down, but they refused. (*Id.*). Altman and his firm allegedly took on new student defense matters without Plaintiffs' involvement. (*Id.* at ¶ 83).

We note that Altman tells a completely different story about everything that transpired between the parties, though he agrees the two sides formed an oral agreement to share cases and split fees. (Altman Motion at 9). The Motions, however, are Rule 12(b)(6) motions to dismiss, and so only the allegations in the Amended Complaint are relevant for disposition. As such, we will not recount the many times Altman, the Altman Firm, Gill, and Kresch disputed Lento's and LLF's allegations and presented their own allegations in their briefs, since such refutations and new allegations are irrelevant at this stage. We note only that they do dispute almost all the allegations against them and claim in contrast that Lento and LLF owe Altman and his firm money. (*Id.* at 8). This disagreement has led to great loathing between the parties, which has burst forth on the docket and before this Court.

### B.    Procedural History

Lento and LLF eventually responded by filing their initial complaint in this Court on August 1, 2022. (ECF No. 1). Simultaneously, they filed a proposed Order to Show Cause for a temporary restraining order (TRO) and preliminary injunction requesting numerous relief including enjoining Altman from ceasing work on cases that began as part of the alleged oral agreement and enjoining Altman and his firm from advertising for student legal services. (ECF No. 2). The Court held what devolved into a chaotic, contentious hearing on those applications on August 4, 2022, during which all parties behaved in a manner unbecoming of their profession, and after which the Court denied the TRO and preliminary injunction applications. (ECF Nos. 7, 12). The Court also ordered the parties to attend mediation and stayed all proceedings for ninety days. (ECF No. 11). That mediation has apparently—sadly—failed.

Plaintiffs filed their Amended Complaint, the complaint relevant here, on September 1, 2022. (ECF No. 17). On November 7, 2022, Altman and the Altman Firm moved for permission to file a motion beyond the allowed page limit. (ECF No. 24). We denied that request. (ECF No. 25). Gill and Kresch filed their Rule 12(b)(6) motion to dismiss for failure to state a claim on November 14, 2022. (ECF No. 26). The same day, Altman and the Altman Firm filed their Rule 12(b)(6) motion to dismiss. (ECF No. 27). Lento and LLF then moved on November 16, 2022 for an extension of time to file their response to the Motions. (ECF No. 28). Perhaps not surprisingly, because these parties feel compelled to contest every minor issue, Defendants opposed the request. (ECF No. 29). The Court granted the request. (ECF No. 30). Defendants then moved for their own extension of time to file their Reply. (ECF No. 31). We granted that request, too. (ECF No. 32). On January 3, 2023, Lento and LLF opposed the Motions. (ECF No. 34, "Pl. Opp'n"). On January 17, 2023, all Defendants replied in one consolidated brief. (ECF No. 35). The following day, Lento and LLF requested permission to file a sur-reply. (ECF No. 36). Defendants, of course, opposed the request. (ECF No. 37). The Court denied the sur-reply application. (ECF No. 38).

Mercifully, the docket has remained silent since.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which the court can grant relief. "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any

reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A complaint survives a motion to dismiss if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To make this determination, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 680). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## III.   DISCUSSION

As the Court stated on the record during the August 4, 2022 hearing: this dispute is ridiculous. All these months later, we are still shocked by both parties' apparent failure to record any aspect of their agreement in writing and to properly account for how and when money exchanged hands and exactly who owed how much money to whom for specific services rendered as part of this alleged agreement. Both parties' carelessness and lackadaisical attitude in that regard is appalling.

Neither party should celebrate any victories they believe they have won from this ruling. Both parties should begin acting like upstanding members of the Bar and behave in a way that

befits their profession. The parties' constant bickering and squabbling through letters on the docket about petty and trivial issues betrays that no one has learned anything since that initial hearing now ten-months past. The parties should have taken the valuable opportunity to mediate this case seriously and hashed this out on their own instead of wasting the Court's time and resources resolving this farce.

Nevertheless, here we are, and we must now contend with these Motions. Given the nature of the multi-defendant, fourteen-count Amended Complaint, we will break our analysis into two main parts: claims against Gill and Kresch and claims against Altman and the Altman Firm. We will dispose of the claims against Gill and Kresch first. Then, we will tackle the Altman claims, and we will divide that section based on the many claims alleged against them.

### A.      Defendants Gill and Kresch

Lento and LLF implicate Gill and Kresch in only two of their fourteen claims: Count I (federal RICO Act) and Count II (New Jersey RICO Act). (Amended Complaint at 7, 16). Plaintiffs have failed to state a plausible RICO claim of any kind against Gill and Kresch. We will begin with the federal RICO claim under 18 U.S.C. § 1962(d). Then we will proceed to the New Jersey RICO claim under N.J.S.A. § 2C:41-2d.

### 1.      Count I: Federal RICO Claim

Following the Third Circuit's three-step test, we begin by identifying the elements required to state a claim against Gill and Kresch for a federal civil RICO claim. Under the federal RICO statute, a plaintiff may instigate a civil action to recover damages if the defendants injured the plaintiff in his business or property by violating 18 U.S.C. § 1962. 18 U.S.C. § 1964(c); *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (3d Cir. 2013). Lento and LLF bring their federal RICO claim under 18 U.S.C. § 1962(d) claiming Altman, Gill, and

Kresch conspired to violate 18 U.S.C. § 1962(c). (Amended Complaint at ¶ 61). To bring a claim

under § 1962(d) for conspiring to violate § 1962(c), a plaintiff must allege: (1) conduct (2) of an

enterprise (3) through a pattern of (4) racketeering activity. *Mierzwa v. Safe & Secure Self*

*Storage, LLC*, 493 F. App'x 273, 276 (3d Cir. 2012). "Moreover, where the plaintiff presents a

fraud-based RICO claim, he must plead with particularity the circumstances of the alleged

fraud." *Id.* To adequately plead a civil RICO conspiracy "a plaintiff must set forth allegations

that address the period of the conspiracy, the object of the conspiracy, and *the certain actions of*

*the alleged conspirators taken to achieve that purpose*. Additional elements include agreement to

commit predicate acts and *knowledge that the acts were part of a pattern of racketeering*

*activity*." *Shearin v. E.F. Hutton Grp., Inc.*, 885 F.2d 1162, 1166–67 (3d Cir. 1989) (abrogated

on other grounds by *Beck v. Prupis*, 529 U.S. 494 (2000)) (emphasis added).

Next, we look at the Amended Complaint's allegations and weed out the conclusory

statements from the actual, well-pled facts. Below is a list of the only times Lento and LLF

mention Gill and Kresch in the entire thirty-six-page, 173-paragraph Amended Complaint:

- ¶ 2: "As to the federal and New Jersey RICO claims namely Defendant KEITH

  ALTMAN, ESQ. . . . conspired with his employees ARI KRESCH and RICH GILL, to

  engage in a pattern of racketeering activity which has damaged Plaintiff LLF and will

  continue to do so."

- ¶ 9: "Defendant ARI KRESCH is a citizen of Michigan."

- ¶ 10: "Defendant RICHARD GILL is a citizen of Michigan."

- ¶ 38: "Richard Gill . . . is the Managing Director of the Altman Firm and has agreed with

  Altman in the commission of all of the acts described below."

- ¶ 39: "Ari Kresch . . . works closely with Altman and has agreed with Altman in the commission of all of the acts detailed."

- ¶ 41: "[Altman] discussed making these demands on The Lento Law Firm with Gill and Kresch and they approved of doing so."

- ¶¶ 42–46, 52, 56–57: Altman allegedly did something else "again with the approval of Gill and Kresch[.]"

- ¶ 61: "This Count is brought against defendants Altman, Gill and Kresch for conspiring to violate 18 U.S.C. §1962(c)[.]"

- ¶ 62: "Altman, Gill and Kresch are 'persons' pursuant to 18 U.S.C. §1961(3)[.]"

- ¶ 64: "Gill works closely with Altman as his Managing Director in this small enterprise and is thus a lower rung participant in its workings."

- ¶ 65: "Kresch also works closely with Altman in operating the firm. He is also a lower rung participant in the Altman Firm."

- ¶ 66: "Altman, pursuant to an agreement with Gill and Kresch, has committed four acts of extortion and two acts of attempted extortion[.]"

- ¶ 67: "Additionally, Altman, Gill, and Kresch agreed to violate the wire fraud statute[.]"

- ¶ 68: "These wire fraud violations occurred over a period of months, are ongoing, and will not stop without judicial intervention. Moreover, this is the regular way Altman, Gill and Kresch conduct the Altman Firm enterprise."

- ¶ 69: "Therefore, Altman, Gill and Kresch have each agreed to the commission of a pattern of racketeering activity[.]"

- ¶ 70: "The racketeering also satisfies an 'open' pattern because the wire fraud is ongoing, will continue indefinitely and is the regular way Altman, Gill and Kresch operate the Altman Firm enterprise."

- ¶ 74: "Altman, Gill and Kresch are 'persons' pursuant to N.J.S.A. §2C:41-1(2)b."

- ¶ 76: "Altman, Gill, and Kresch have committed a 'pattern of racketeering activity' pursuant to N.J.S.A. §2C:41-1(2)(d)."

That is all.

Almost all these allegations are conclusory statements masquerading as facts. They are "[t]hreadbare recitals of the elements . . . supported by mere conclusory statements," which do not suffice to state a claim. *Iqbal*, 556 U.S. at 678. These allegations presume an agreement between Altman, Gill, and Kresch; they do not adequately plead facts to suggest that one truly existed. Lento and LLF simply note that Gill and Kresch agreed to the alleged conspiracy because Plaintiffs know that a conspiracy requires an agreement.

This brings us to the final step. When you strip away all the conclusory allegations, it reveals that, in the most generous possible light, these are the only factual allegations against Gill and Kresch entitled to a presumption of truth: (1) Gill and Kresch are Michigan citizens; (2) Gill is the Altman Firm's Managing Director and works closely with Altman; (3) Kresch works closely with Altman; and (4) Altman discussed making his alleged demands with Gill and Kresch. This is not nearly enough to survive a Rule 12(b)(6) motion to dismiss. *See Bell Atl. Corp.*, 550 U.S. at 570.

We cannot consider Lento's and LLF's allegations that Gill and Kresch agreed with Altman or approved of Altman's plan because they are conclusory statements related to elements required to successfully plead civil RICO claims. They are not "facts" entitled to a presumption

of truth. Lento and LLF do not allege when any discussions took place, where they took place, how they took place, whether they were in person, over the phone, through text, over email, by facsimile, smoke signals, Morse Code, or any other method. They do not plead why Altman would involve either of these individuals in his alleged scheme in the first place, what Kresch's actual role at the Altman Firm is other than that he "works closely" with Altman, what either Gill or Kresch stood to gain, or, most important of all, what "certain actions" they took to achieve the alleged conspiracy's purpose other than "agree" to it. What exactly was their role in this alleged scheme? We have no idea and, apparently, neither do Plaintiffs.

Even if we found that every allegation Lento and LLF made against Gill and Kresch deserved the presumption of truth, there are still not enough facts to adequately state a civil RICO conspiracy claim against Gill and Kresch. As the *Shearin* Court said, Lento and LLF must show not just agreement and the period and object of the conspiracy, they must also allege the "certain actions" the alleged conspirators took to achieve the conspiracy's purpose as well as knowledge that those actions were part of a pattern of racketeering activity. *Shearin*, 885 F.2d at 1166–67.

Lento and LLF have failed to do so. Nowhere in the Amended Complaint do Lento and LLF allege anything remotely close to actions Gill and Kresch took to achieve the alleged conspiracy's purpose. Nor are there any allegations that Gill and Kresch knew those unpled actions were part of a pattern of racketeering activity. That makes sense. How could Gill and Kresch know their actions involved racketeering if they are not alleged to have acted in any way to further the alleged conspiracy?

No matter how one looks at the Amended Complaint and the allegations within it, Lento and LLF have utterly failed to sufficiently and plausibly plead that Gill and Kresch are liable for violating § 1962(d). As such, we will dismiss Count I as to Gill and Kresch.

### 2.      Count II: New Jersey RICO Claim

To state a New Jersey RICO ("N.J. RICO") claim, a plaintiff must allege: "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by, or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy." *Marina Dist. Dev. Co., LLC v. Ivey*, 216 F. Supp. 3d 426, 436 (D.N.J. 2016).

The Amended Complaint fails to state a plausible N.J. RICO claim against Gill and Kresch for similar reasons as to why it failed to allege a plausible federal RICO claim. Lento and LLF needed to plead facts that showed that Gill and Kresch *participated in the conduct* of the enterprise's affairs, and that Gill and Kresch *participated* in a pattern of racketeering activity.

We will not belabor the point. Lento's and LLF's Amended Complaint does not plead how, if, or in what way either Gill or Kresch participated in the alleged conspiracy to defraud Lento and LLF. Based on the Amended Complaint, the most we can say is that Gill and Kresch made some agreement with Altman or that they approved of Altman's alleged scheme—blanket conclusory statements that we find are not entitled to a presumption of truth. And even if they were, they do not suffice to plausibly plead participation in the alleged enterprise's conduct for all the same reasons listed above.

As such, we will also dismiss Count II as to Gill and Kresch. Since there are no other counts alleged against either Gill or Kresch, we subsequently dismiss both Gill and Kresch as defendants in this case.

### B.     Defendants Altman and the Altman Law Firm

Which brings us to Lento's and LLF's claims against Altman and the Altman Firm. They are numerous. As detailed below, we will grant in part and deny in part the Altman Motion.

### 1.     Count I: the Federal RICO Claim

Importantly, Lento and LLF bring their RICO claims against only Altman—not the Altman Firm. Also importantly, Lento and LLF do not allege that Altman violated § 1962(c). Instead, they allege he, along with Gill and Kresch, violated § 1962(d) by conspiring to violate § 1962(c). A conspiracy "is the *agreement* to commit one or more unlawful acts." *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (emphasis in original). In other words, a conspiracy "is 'the combination of minds for an unlawful purpose.'" *Smith v. United States*, 568 U.S. 106, 110 (2013) (quoting *United States v. Hirsch*, 100 U.S. 33, 34 (1879)). "It is axiomatic that a conspiracy cannot continue without at least two genuine parties to the agreement." *United States v. Portela*, 167 F.3d 687, 700 (1st Cir. 1999).

More specific to this case, as mentioned earlier, to bring a § 1962(d) claim for conspiring to violate § 1962(c), a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. *Mierzwa*, 493 F. App'x at 276. "Moreover, where the plaintiff presents a fraud-based RICO claim, he must plead with particularity the circumstances of the alleged fraud." *Id.* To adequately plead a federal civil RICO conspiracy "a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose. Additional elements include

agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity." *Shearin*, 885 F.2d at 1166–67.

Lento and LLF have failed to adequately plead that Altman violated § 1962(d). Plaintiffs do allege particularized facts about Altman's purported scheme to wrangle more money from them than they claim their oral arrangement with him called for. But they do not adequately allege that Altman engaged in a conspiracy to commit federal RICO violations.

The only other people Lento and LLF allege conspired with Altman are Gill and Kresch. But, as we detailed earlier, almost every allegation Plaintiffs put forth to implicate Gill and Kresch in the conspiracy is a conclusory statement meant to bolster mere recitations of conspiracy's elements, namely, that there was any agreement between Altman, Gill, and Kresch. Lento and LLF repeat over and over again in their Amended Complaint phrases like: Altman conspired with his employees Kresch and Gill (¶ 2); Gill [and Kresch] agreed with Altman in the commission of all of the acts described below (¶¶ 38, 39); "again with the approval of Gill and Kresch" (multiple paragraphs); "pursuant to an agreement with Gill and Kresch" (¶ 66); "Altman, Gill, and Kresch agreed to violate the wire fraud statute" (¶ 67); and so on, and so on. These allegations simply state the conclusion that there was an agreement. Without facts pleading an agreement, we cannot find that there was one. *See Portela*, 167 F.3d at 700.

The Amended Complaint states facts demonstrating that Altman alone allegedly made multiple demands for more money from Lento and LLF. But they do not plead facts demonstrating that an agreement existed between Altman and anyone else to commit racketeering. Since Lento and LLF have failed to adequately plead an agreement, they have failed to plead a conspiracy and thus failed to state a claim pursuant to § 1962(d). Consequently, Count I must fall away.

2.      **Count II: the New Jersey RICO Claim**

Now we move to Count II: the N.J. RICO claim, also only against Altman, not the Altman Firm. To state a N.J. RICO claim, a plaintiff must allege: "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by, or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy." *Marina*, 216 F. Supp. 3d at 436.

Although the N.J. RICO statute and its federal analog are similar, New Jersey's RICO statute is broader. *Ford Motor Co. v. Edgewood Props., Inc.*, Civ. Nos. 06-1278, 06-4266, 2009 WL 150951, at *10 (D.N.J. Jan. 20, 2009). New Jersey courts "take a liberal stance in permitting plaintiffs to plead [N.J. RICO] violations, rejecting the narrow construction of the federal statute that many circuits, including this one, have adopted." *Id.* That broad construction allows Lento and LLF's N.J. RICO claim to proceed where the federal RICO claim failed.

Plaintiffs have pled the existence of an enterprise. N.J.S.A. § 2C:41-1c defines "enterprise" to include "any individual, . . . association, or other legal entity." The Amended Complaint alleges that the Altman Firm is the enterprise in question here. (Amended Complaint at ¶ 75). The statute's definition also contemplates that Altman himself—an individual—may be the "enterprise" in question. Lento and LLF have also pled that Altman and his firm engaged in activities that affected commerce. The entire dispute revolves around an alleged business agreement between Lento and Altman. As to the third N.J. RICO element, there is no question that, whether we consider Altman or the Altman Firm as the enterprise, Altman is employed by or associated with the enterprise.

16

Lento and LLF also adequately pled that Altman participated in the conduct of the enterprise's affairs. They allege with particularity that Altman demanded money on multiple occasions from Lento and LLF. They also allege they did not owe him the money he demanded and only paid it because he threatened he would stop working on cases assigned to him, file state bar complaints, and tell clients Lento would not pay him to try to injure or ruin Lento's business.

But did these demands and threats constitute "a pattern of racketeering activity?" As pleaded: yes. N.J.S.A. § 2C:41-1a(1)(h) defines "racketeering activity" to include extortion and § 2C:41-1a(2) incorporates certain crimes enumerated in the United States Code, including the Hobbs Act, 18 U.S.C. § 1951, into the definition of "racketeering activity." In part, the Hobbs Act makes it a crime to affect commerce in any way by extortion. 18 U.S.C. § 1951(a). Section 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." Cases interpreting the Hobbs Act "have repeatedly stressed that the element of 'fear' required by the Act can be satisfied by putting the victim in fear of economic loss." *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (quoting *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976) (overruled on other grounds by *Perrin v. United States*, 444 U.S. 37 (1979))). We should consider that fear from the victim's perspective, and we must find proof that the victim reasonably believed (1) "that the defendant has the power to harm" him, and (2) "that the defendant would exploit that power to the victim's detriment." *Id.* Further, Section 2C:41-1d defines a pattern of racketeering to require (1) at least two incidents of racketeering which occurred within ten years of each other, and (2) "a showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants, or victims or methods of commission . . . and are not isolated incidents." N.J.S.A. § 2C:41-1d(1)–(2).

Assuming the facts Lento and LLF plead are true, as we must, they have satisfied their burden at this stage of the litigation. Lento and LLF allege that on six different occasions, Altman threatened to breach their oral agreement, walk away from the venture, and stop working on the cases assigned to him. (Amended Complaint at ¶¶ 41–46). Lento acquiesced to the demands four times, allegedly paying Altman roughly $530,000 he claims he did not owe Altman and amending the purported oral agreement to award Altman a larger share of the cut. (*Id.* at ¶¶ 41–44). According to Lento and LLF, after the first time Lento refused to make a demanded payment, Altman threatened to file a state bar complaint against Lento and tell all his clients he stopped working on their cases because Lento would not pay him. (*Id.* at ¶ 46).

This is enough to demonstrate a pattern of racketeering activity under the New Jersey RICO statute. The demands allegedly occurred six times in a little more than a year. They allegedly involved the same purposes (more money for Altman), the same participants (Altman and Lento), and the same victims (Lento and LLF). And, looking at this from Lento's point of view, if true, these purported threats would reasonably cause Lento to believe that Altman had the power to harm him financially and that he would do so if Lento did not follow through with the demanded payments. Lento alleges that he originated every case as part of the oral agreement, and if Altman stopped working on these cases, it would force Lento to, at minimum, deal with negative publicity toward his business. Further, Lento alleges that Altman has, during this year-long period of purported extortion, also started soliciting some of his own clients, ostensibly in violation of their agreement. This could reasonably put Lento in fear that if he did not pay Altman, he might ramp up his efforts to solicit clients away from Lento and LLF. Those increased efforts, coupled with Altman's alleged threats to publicly bad mouth Lento and LLF, could cause serious financial harm to Lento and LLF.

Finally, alleged injury is obvious. At minimum, Lento and LLF allege they paid Altman more than $500,000 that he was not entitled to receive as part of a legitimate agreement. As such, Plaintiffs have adequately pled a New Jersey RICO claim against Altman. We want to stress that we are not finding now that Altman violated the N.J. RICO statute. We only find that Lento and LLF have stated a plausible claim for relief under the N.J. RICO statute sufficient to survive a Rule 12(b)(6) motion to dismiss. Therefore, we will deny the Altman Motion's request to dismiss Count II against Altman.

In sum, we will dismiss Count I against Altman, which means we will dismiss Count I in its entirety. We will, however, allow Count II to proceed only against Altman.

### 3.    Count III: Breach of Contract

To state a valid breach of contract claim, Lento and LLF must allege that: (1) the parties formed a valid contract; (2) Altman and the Altman Firm failed to perform under the contract's terms; and (3) Lento and LLF suffered damages because of that failure to perform. *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. App. Div. 2007). To show there was a valid contract, Plaintiffs must show the basic precepts of contract formation: offer, acceptance, and consideration. *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021). That agreement's terms must also "be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Id.* (quoting *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992)). Lento and LLF have failed to plead an adequate breach of contract claim.

We again begin by removing and ignoring all of Lento's and LLF's allegations which are not factual allegations and thus are due no presumption of truth. When we do so, we see that Lento and LLF have not adequately pled damages.

19

Lento and LLF plead multiple times that the alleged agreement provided that Lento would "associate" cases to Altman for Altman to "take the lead" on. (Amended Complaint at ¶¶ 21, 81). This is not exactly the most specific definition to allow us to determine if Altman performed. *See Goldfarb*, 245 A.3d at 577. "Take the lead" could mean a lot of things. But, Lento and LLF plead that after their second refusal to pay Altman, he "ceased work" on the cases assigned to him. (Amended Complaint at ¶ 83). Whatever Lento and LLF meant exactly when they said Altman's responsibilities under the agreement were to "take the lead," that clearly means doing some work, and ceasing all work is therefore a failure to perform.

To be clear, though, Altman did not fail to perform as it relates to the alleged fee-split arrangement. Altman may have demanded more money, but a reasonable reading of the Amended Complaint reveals that it was Lento's and LLF's responsibility under the alleged agreement to split the fees and pay Altman accordingly. Altman cannot fail to perform if it was not his responsibility to perform in the first place. *See Murphy*, 920 A.2d at 689 (stating that a required element of breach of contract is the defendant's failure to perform *his obligations* under the contract).

Beyond that, after we removed all of Lento and LLF's conclusory allegations that an agreement existed, we are left with the following three additional terms of their oral agreement specific enough to determine whether Altman allegedly performed or not: (1) "it was Altman's responsibility to send out fee agreements to sign new clients[,]" (Amended Complaint at ¶ 29); (2) there was a non-compete provision wherein, while in cooperation with Lento and LLF, Altman allegedly agreed that the only student defense cases on which he would work were those in association with Lento and LLF, (*id.* at ¶ 81); and (3) while working with Lento and LLF, Altman would not advertise independently for student defense cases, (*id.*).

20

Taking Lento's and LLF's allegations as true, Altman failed to perform all four terms. He stopped working after he agreed to "take the lead on" cases assigned to him. Lento and LLF also allege he neglected to send out fee agreements or would send them out late, after the client had already paid. (*Id.* at ¶¶ 29–30). They allege he took on new student defense matters independent from Lento and LLF. (*Id.* at ¶ 83). And they allege he independently advertised for student defense matters. (*Id.*).

But Lento and LLF must also allege damages to adequately plead breach of contract. *Murphy*, 920 A.2d at 689. They have failed to do so. Lento and LLF plead a conclusory allegation that "[a]s a direct and proximate result of Defendant Altman and Defendant the Altman Firm's breach of contract as alleged, Plaintiffs have been caused to sustain damages." (Amended Complaint at ¶ 84). This is the epitome of a conclusory allegation which merely recites legal elements and is exactly the type of allegation the Supreme Court instructs all district courts not to afford a presumption of truth. It is not a factual allegation.

Nowhere else in the complaint can the Court find an example of a factual allegation Lento and LLF make to show how exactly Altman's failure to perform on those four terms caused them damages. They do not mention a specific client they otherwise would have been able to bring on board or any other type of real, non-hypothetical financial injury they suffered from Altman's failure to adhere to the noncompete and advertising prohibition terms. They do not plead that they have suffered any specific losses following Altman's work stoppage. And as for the fee agreements, they do not plead that clients did not pay any fees due to Altman's failure. In fact, Lento and LLF admit that many clients had already paid before Altman sent the agreements. (*Id.* at ¶¶ 29–30). As such, these claims fall short of the standard required to survive a Rule 12(b)(6) motion to dismiss.

Therefore, we will dismiss Count III in its entirety.

### 4. Count IV: Breach of the Covenant of Good Faith and Fair Dealing

Although Lento and LLF have not adequately pled breach of the purported express terms of their oral agreement with Altman, they have pled enough to state a plausible claim for breach of the implied covenant of good faith and fair dealing. Every contract formed in New Jersey contains an implied covenant of good faith and fair dealing. *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997). In other words, "[i]n every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'" *Id.* (quoting *Palisades Props., Inc. v. Brunetti*, 207 A.2d 522, 531 (N.J. 1965)). Further, a party may breach that covenant even if they have not breached any express terms of an agreement. *See id.*

As alleged, Altman has injured Lento's and LLF's right to receive the fruits of their alleged agreement. Lento and LLF claim that they entered into an agreement with Altman for Altman to work on student defense cases. The fruit Lento and LLF stood to receive from that agreement was the sixty percent share of the fees from each client they allegedly were due under the agreement. Although riddled with conclusory statements, the Amended Complaint does state enough facts, which we must presume as true, to allege a claim for bad faith.

The allegations state that during their agreement's existence, Altman, on six occasions, refused to continue working on cases assigned to him by Lento and LLF unless they paid him more money than Plaintiffs claim the agreement owed him. He also apparently demanded they alter the fee structure. As alleged, these were not good faith efforts to renegotiate the deal or to terminate the deal and reassociate active cases back to Lento and LLF because Altman was unhappy with the fee structure. Plaintiffs allege that when they did not pay Altman, he not only

stopped working on cases, but also would not return case files to Lento and LLF to make it easier for them to work on those cases in his absence. The natural result of these allegations is a plausible claim that Altman injured Lento's and LLF's right to receive the fruits of their agreement, namely, sixty percent of the payment received upon satisfactory completion of a matter. *See United Roasters, Inc. v. Colgate–Palmolive Co.*, 649 F.2d 985 (4th Cir. 1981) (finding breach of covenant of good faith where party ceased performance while agreement was still in effect because they held an obligation to continue good faith performance up until its right to terminate the agreement became effective).

Altman argues that Lento and LLF "have not provided any evidence" and "have not proven" that Altman and the Altman Firm breached their duty of good faith and fair dealing. (Altman Motion at 31). But the law does not require evidence or proof at the pleading stage; it only requires that the factual allegations in the Amended Complaint (when taken as true and read in the light most favorable to the plaintiff) state a plausible claim for relief. *See Fowler*, 578 F.3d at 210 (quoting *Phillips*, 515 F.3d at 233). These are only allegations, but they are enough to survive here. Altman may save his arguments about a lack of proof or evidence for summary judgment. Count IV will proceed.

### 5.    Count V: Tortious Interference with a Contract

We will make quick work of Plaintiffs' tortious interference with a contract claim. In New Jersey, the tort of interference with a contract has four elements: "(1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *DiGiorgio Corp. v. Mendez and Co., Inc.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002)

(citing *Printing Mart–Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Lento and LLF have not stated a claim for tortious interference with a contract.

Even if we assume that Lento and LLF have existing contractual relationships with the approximately one hundred clients they claim they assigned to Altman and the Altman Firm, and even if we assume Altman and his firm have intentionally and maliciously interfered with those relationships, Lento and LLF have not pleaded facts that plausibly show either (1) that interference caused any breach or loss of a contract or (2) any damages resulting therefrom. The only interference Plaintiffs allege from Altman and his firm is that after Lento refused to make a particular payment to Altman, Altman stopped working on cases. (Amended Complaint at ¶ 100). The Amended Complaint then states, in a highly conclusory matter: "There is more than a reasonable likelihood that the interference of Defendants Altman and the Altman Firm, if permitted to continue, would ultimately cause the loss of the prospective economic and professional advantage to Plaintiffs . . . ." (*Id.* at ¶ 103). Notice the phrasing: "*likelihood* that the interference . . . *would ultimately cause* the loss of the prospective economic and professional advantage to Plaintiffs." (*Id.*) (emphasis added). Lento and LLF admit, then, that this purported interference *has not actually caused any losses*.

Lento and LLF do not plead actual losses or broken contracts. Plaintiffs just conclude on their own that this might happen at some point. They do not state any facts that since Altman and his firm stopped working on the cases, they have suffered damages, or a client left. (*See id.* at ¶ 104) (making conclusory statements, not asserting facts, about the existence of damages).

Independently, it is at least arguable that when Lento and LLF associated these cases to Altman and his firm and had them "take the lead on" those cases, they made Altman and his firm parties to the contracts, thus killing a tortious interference claim in its crib. *See Printing Mart–*

*Morristown*, 563 A.2d at 37 (stating that it is "fundamental" to a tortious interference claim that plaintiffs must direct the claim at defendants who are not parties to the relationship).

Consequently, we dismiss Count V in its entirety.

### 6.    Count VI: Professional Negligence; Legal Malpractice

To establish a claim for negligence, a plaintiff must establish (1) existence of a duty of care the defendant owed to the plaintiff, (2) breach of that duty, (3) causation, and (4) damages. *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015). Although both parties' briefs are difficult to decipher, it appears that both parties frame this claim as one of legal malpractice by Altman and his firm against Lento and LLF. (*See* Altman Motion at 34–35; Pl. Opp'n at 31–33).

We will take the parties at their apparent words and assume that is the case. We will also summarily dismiss this Count VI. As a matter of law, Altman and the Altman Firm cannot have committed legal malpractice against Lento and LLF because those parties never had an attorney–client relationship. *See Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1070 (N.J. 1996). It is that attorney–client relationship which creates the duty of care on which one premises a legal malpractice claim. *See id.*

Lento and LLF attempt to get around this by arguing that there are exceptions to this rule. Namely, they rely on *Petrillo v. Bachenberg*, 655 A.2d 1354 (N.J. 1995). The *Petrillo* Court did observe that "attorneys may owe a limited duty in favor of specific non-clients." *Id.* at 1357. The *Petrillo* Court cited to cases where courts recognized such an exception, but none of those cases involved duties by attorneys owed to other attorneys with whom they worked or any situation remotely similar. *See id.* at 1357–58. Some examples the *Petrillo* Court gave involved: (1) attorneys for a buyer owing a duty to the sellers for failure to get signatures from their own clients to secure a debt; (2) an attorney owing a duty to a decedent's estate after knowingly

facilitating improper transactions with the person who held the decedent's power of attorney; and (3) township attorneys owing a duty to a construction project bidder after failing to obtain easements they had said they would obtain as part of the bid package. *Id.* The *Petrillo* Court summarized its findings on this exception as: when courts relax the requirement for a direct attorney–client relationship to establish a duty of care, "they typically limit a lawyer's duty to situations in which the lawyer intended or should have foreseen that the third party would rely on the lawyer's work[,]" such as when an attorney drafts an opinion letter issued in connection with a securities offering. *Id.* at 1359.

We think it is abundantly clear that none of these situations involve anything close to the situation alleged here, where one attorney and his firm are suing another attorney and his firm over an alleged disagreement about who owes whom legal fees. We decline to hold in any way that this limited "non-client" exception extends to other attorneys with which one works.

As such, we dismiss Count VI in its entirety with prejudice because Lento and LLF could never state a claim for relief on a legal malpractice claim against Altman and the Altman Firm.

### 7.      Count VII, VIII, and IX: Negligence Per Se

We will combine the next three claims for simplicity because we will dismiss them all with prejudice for the same reasons. Even if we assumed that every fact Lento and LLF pled is true, as a matter of law, there is no conceivable way that they could state a plausible claim for relief under a negligence per se theory involving rules of professional conduct that in no way incorporate the common law negligence standard.

"Negligence per se is not often invoked in New Jersey generally because its application is so narrow." *Labega v. Joshi*, 270 A.3d 378, 388 (N.J. Sup. Ct. App. Div. 2022). "[T]he only occasion for application of negligence per se in New Jersey is in 'the exceptional situation,'

where a statute specifically incorporates a common law standard of care[.]" *Id.* at 389 (internal

citations omitted) (quoting *Horbal v. McNeil*, 328 A.2d 604, 607 n.1 (N.J. 1974)). The example

the *Labega* Court provides perfectly illustrates this concept. There the court cited New Jersey's

careless driving statute, N.J.S.A. § 39:4-97, whose plain language states that it prohibits

negligent driving. *Id.* Thus, if a jury found that one had violated the careless driving statute, they

necessarily must have found that the driving was negligent. *Id.* Because the careless driving

statute directly and plainly incorporated the common law negligence standard into itself, it would

be definitionally inconsistent to find that a driver violated the statute but was not negligent. *Id.*

      That is negligence per se. Violation of a statute generally—one which does not directly,

plainly, and explicitly incorporate a common law standard of care—is not. *See id.* 388–89. It is

merely one "circumstance which the jury should consider in assessing liability." *Id.* (quoting

*Eaton v. Eaton*, 575 A.2d 858, 866 (N.J. 1990)).

      Putting aside the issues of which, if any, of these rules apply, and whether their alleged

violation would ever result in Lento and LLF having a cause of action against Altman and his

firm, none of the rules of professional conduct to which Lento and LLF cite incorporate a

negligence standard. In their plain language, New Jersey Rules of Professional Conduct 1.16,

8.4, and 7.1; Michigan Rules of Professional Conduct 1.16, 8.4, and 7.1; and the American Bar

Association's Model Rules of Professional Conduct 1.16, 8.4, and 7.1 do not incorporate a

negligence standard that would cause their alleged violation to constitute negligence per se under

New Jersey law. The word "negligence" or its common law components appear nowhere in those

rules' texts. These claims, therefore, fall flat on their faces.

As such, we dismiss Counts VII, VIII, and IX in their entirety with prejudice because Lento and LLF could never state a negligence per se claim against Altman based on these various rules of professional conduct.

### 8.      Count X: Unjust Enrichment

The Court pauses here to note that the parties' briefing on the following two counts is strikingly poor. Neither party cites to any law or presents any cases which set out the elements to state claims for unjust enrichment and conversion. The Altman Motion fails to make any argument that Lento and LLF failed to state plausible claims for unjust enrichment and conversion. (Altman Motion at 38–39). Instead, as they do throughout most of their brief and reply, Altman and the Altman Firm steadfastly dispute the factual accuracy of Lento's and LLF's claims—an issue for summary judgment, not motions to dismiss. In their opposition, Lento and LLF point this out, but then make no argument about why the facts they have pled state plausible unjust enrichment and conversion claims. (Pl. Opp'n at 35–36). The Court is left to watch these two parties scream into the void and must analyze the sufficiency of these claims on its own.

To state a claim for unjust enrichment, a plaintiff must show that: (1) the defendant received a benefit and (2) retention of that benefit without payment would be unjust. *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994). It is unjust to retain the benefit without payment if, had "the true facts [been] known to the plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred." *Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 334–35 (N.J. Super. Ct. App. Div. 1966). Unjust enrichment is a quasi-contract principle of law. *See id.* at 334. It is a form of recovery the law allows when there is no contract or the contract was invalid, but principles of justice, reason, and fairness dictate

that a court should find a contract "implied by law." *Id.* "Courts employ the fiction of Quasi or constructive contract with caution." *Id.*

Lento and LLF have not stated and cannot state a plausible unjust enrichment claim. To begin, Lento and LLF allege breach of an oral contract between themselves and Altman. There is no dispute that the parties struck a valid oral agreement here. As reasoned earlier, Plaintiffs failed to state a claim for breach of contract, not because they failed to plead a contract's existence, but because they failed to adequately plead damages.

New Jersey courts have held that quasi contract principles applied through unjust enrichment claims are not proper remedies where valid contracts exist. *See Goldsmith v. Camden Cty. Surrogate's Off.*, 975 A.2d 459, 463 (N.J. Super. Ct. App. Div. 2009) ("Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability."); *see also Nat'l Amusements, Inc. v. N.J. Tpk. Auth.*, 619 A.2d 262, 267 (N.J. Super. Ct. Law Div. 1992) ("Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law."). There is a recognized exception to this rule meant to deter public corruption and the bribery of public officials. *See, e.g., Cty. of Essex v. First Union Nat. Bank*, 862 A.2d 1168, 1172–73 (N.J. Super. Ct. App. Div. 2004) (rev'd on other grounds by *Cty. of Essex v. First Union Nat. Bank*, 891 A.2d 600 (N.J. 2006)). That exception, though, is extraordinary and limited, and we decline to extend it here.

As such, since Lento and LLF plead and argue that they formed a valid oral contract with Altman, we find that, as a matter of law, Lento and LLF cannot state a plausible unjust enrichment claim. Consequently, we will dismiss Count X with prejudice.

9.      **Count XI: Conversion**

Lento and LLF only allege a conversion claim for Altman's alleged wrongful possession of client files. (Amended Complaint at ¶¶ 157–59). To state a conversion of goods claim, a plaintiff must show "some repudiation by the defendant of the owner's right, or some exercise of dominion over them by him inconsistent with such right, or some act done which has the effect of destroying or changing the quality of the chattel." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 660 (N.J. 2020) (quoting *Woodside v. Adams*, 40 N.J.L. 417, 431 (N.J. 1878)); *see also Chi. Title Ins. Co. v. Ellis*, 978 A.2d 281, 287 (N.J. Super. Ct. App. Div. 2009) (quoting the Restatement (Second) of Torts § 222A(1) (1965)) ("Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other for the full value of the chattel."). A plaintiff must also show that he made a demand for the goods and that the defendant refused to do so. *Meisels*, 222 A.3d at 660. "Where possession is initially lawful, it is not tortious unless and until the possessor acts in a way that conflicts with the true owner's rights." *Id.* at 661.

Here, Lento and LLF have not shown they have a plausible conversion claim. Lento and LLF appear to recognize that Altman and his firm were, at least at one point, in lawful possession of these files. They must because, to be clear, Lento and LLF never specifically plead that they possessed any of these files in the first place. Plaintiffs allege that they demanded Altman and the Altman Firm turn the files over to them and Altman refused. (Amended Complaint ¶ 159). But, Lento's and LLF's conclusory allegations notwithstanding, they have not shown that Altman's and the Altman Firm's refusal to give them the files (1) repudiates any legal rights Lento and LLF have over the files; (2) is inconsistent with any rights Lento and LLF may have over the files; or (3) effectively destroys or changes the quality of the chattel.

Starting with the first point, Lento and LLF have not shown they have any specific legal rights over these files that Altman could repudiate. They do not allege that they created these files. They do not allege that they then gave these files to Altman for him to use while he worked on the cases. They do not allege that the files contain their own work product. The Amended Complaint is painfully silent. For all the pleadings show, these files might contain entirely Altman and the Altman Firm's work product. In fact, for all the Amended Complaint says about these files, they might as well be empty manila folders.

What's more, client files do not belong to the clients' attorneys. They belong to the clients themselves. *See Frenkel v. Frenkel*, 599 A.2d 595, 597–99 (N.J. Super. Ct. App. Div. 1991) (holding that trial court was correct to order former counsel to turn over photocopies of former client's file to new counsel despite lien on former client and consistently referring to the files throughout the opinion as the client's property); *see also Matter of Breen*, 552 A.2d 105, 111–14, 118–19 (N.J. 1989) (finding a pattern of neglect by attorney and subsequently disbarring him, in part, because he repeatedly failed or refused to turn files back over to clients). As such, since these files are *the clients'* property, not any attorney's property, we cannot and will not say that Lento and LLF have any legal possessory right over the files that Altman and the Altman Firm could repudiate. Without the existence of any legal right for Altman and his firm to repudiate, any conversion claim Lento and LLF try to assert is dead on arrival.[1]

---

[1] It is also worth mentioning that nowhere in the Amended Complaint or in any of the parties' briefs do they mention whether they asked their clients, given the falling out between Lento and Altman, who they wanted to continue as their attorney moving forward—Lento and LLF, Altman and his firm, or some other lawyer or firm. Had Lento and LLF asked the clients who they wanted as counsel, and they said they wanted Altman, then Lento and LLF have zero right whatsoever to claim ownership of these files.

Additionally, beyond the conversion claim, this apparent disregard for or apathy toward the client's wishes is dispiriting at best and unethical at worst. Attorneys are servants of their clients. To be clear, we are not specifically finding an ethical violation occurred here. We merely note that this conversion claim about client files—files which rightfully belong to the alleged 100 some-odd clients, not Lento and LLF or Altman and the Altman Firm— epitomizes the parties' selfish disregard for the clients they claim to represent.

Second, even if we assume Lento and LLF had some legal right to the files, the Amended Complaint admits that these were files for cases on which Altman and his firm worked. It is a fair assumption, then, that these files contain Altman's and his firm's work product. As such, to say Lento and LLF have a legal right to the files, we must also say that Altman and his firm have equal right to the files, since everyone appears to have been working in some capacity on these clients' cases. Thus, we cannot say that Altman's and the Altman Firm's decision to keep the files is inconsistent with any rights Lento and LLF may have, too. *See Meisels*, 222 A.3d at 660.

Still, even if we found that Plaintiffs have a legal right over the files and Altman's refusal to give them over was inconsistent with those rights, we find that Altman's and his firm's choice to keep them is "harmless." *See LaPlace v. Briere*, 962 A.2d 1139, 1145 (N.J. Super. Ct. App. Div. 2009) (holding there was no conversion where plaintiff's horse died while in a defendant's care). "The theory behind conversion is that the actor has exerted such a major and serious interference with the plaintiff's rights to the chattel that in essence the law will force a judicial sale of the chattel upon the defendant." *Id.* (citing *Prosser and Keeton on Torts* § 15 at 90 (5th ed. 1984)). This possession of files is not so serious to rise to the level of conversion. Keeping these files does not destroy or change their quality to Lento and LLF. They do not allege they ever owned them in the first place. Even if they did, as "progenitor" of all matters, presumably they have these clients' contact information and could—and should—collect whatever information they need from these clients to continue to uphold the duties they owe them.

---

Further, we have significant ethical questions about this entire arrangement. Lento and LLF claim that they were the "progenitors" of all cases and that they then would associate some of these cases to Altman and his firm to take the lead. Were any of the clients aware that the firm that solicited them was not the firm handling their cases? Maybe, but the Amended Complaint does not say. We do not decide here that an ethics violation occurred, because we simply do not know whether Lento and LLF made any of the clients aware that an entirely different firm was "taking the lead" on their cases, much less had their consent.

As such, we find that Lento and LLF have not stated a plausible conversion claim and cannot state one because they have no legal right to these files. Consequently, we will dismiss Count XI with prejudice.

### 10.   Count XII: Lanham Act Violations

Plaintiffs allege multiple Lanham Act claims against Altman and the Altman Firm: unfair competition, false representations, false designation of origin, and false advertising. All these purported claims arise from the same statute, 15 U.S.C. § 1125(a). Presumably, § 1125(a)(1) is where Plaintiffs found the language "false designation of origin" and "false representation." For our purposes, though, these asserted claims boil down to unfair competition under § 1125(a)(1)(A) and false advertising under § 1125(a)(1)(B).

The Amended Complaint is remarkably conclusory at many points, but perhaps no more so than this Lanham Act section. Lento and LLF drafted five paragraphs in their Lanham Act section: Paragraph 160 realleges all preceding paragraphs; Paragraph 161 quotes the Lanham Act's text; Paragraph 162 is conclusory except that it pleads that "Lento Law Firm" is a mark belonging to Plaintiffs, and they did not authorize Altman's purported use of it; Paragraph 163 is a conclusory statement, not a fact; and Paragraph 164 is a conclusory statement that regurgitates magic buzzwords without averring to any facts.

Lento and LLF provide little for the Court to work with to assess their Lanham Act claim. They state, almost in passing, that the Lento Law Firm mark is their mark, and that they did not authorize its use. They also state in Paragraph 56: "Beginning on or about August 4, 2022, Altman . . . posted Pay Per Click ads on Google which use the Lento Law Firm name . . . but direct web traffic to the Altman Firm." Lento and LLF then insert seven images that appear to show Google advertisements that link to www.kaltmanlaw.com, but the header says Lento Law

Firm or includes the name Joseph Lento. (Amended Complaint ¶ 56, Images 2–8). Those are the only facts pled that relate to these claims, and so the Court will evaluate them based on those facts alone, as if they were true.

As set out below, Lento and LLF have failed to state any plausible Lanham Act claims.

### i.      Unfair Competition

Courts analyze unfair competition claims in violation of § 1125(a)(1)(A) identically to federal trademark infringement under § 1114. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). To state such a claim, a plaintiff must show: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *Id.* "A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Id.* at 211 (quoting *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992)). "Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). We do not need to here.

Plaintiffs have not shown, and cannot show, a likelihood of confusion between their mark and any mark Altman or the Altman Firm might have. First, Lento and LLF have not alleged what mark used by Altman and his firm is the mark they believe the public might confuse with "Lento Law Firm." As such, it is impossible for us to "compare [Lento Law Firm] against [a] challenged mark." *Id.* But even if we assume they did, and that mark is in some form similar to or derivative of "K Altman Law" (i.e., the URL in the Amended Complaint's inserted images), no consumer could possibly confuse the two marks because they are not similar. Although both

belong to law firms, their names are not similar. The only confusion a hypothetical consumer might have if they clicked on the alleged links would be, "Why did that link direct me to a completely different law firm's website?" They would not think the so-called marks are in any way similar. As such, Lento's and LLF's unfair competition claim fails as a matter of law, and we will dismiss it with prejudice.

### ii.      False Advertising

To show Lanham Act false advertising, a plaintiff must demonstrate that: (1) the defendant has made false or misleading statements as to his own product or another's; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the description is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, 197 F. App'x 120, 122 n.1 (3d Cir. 2006) (quoting *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3d Cir. 1992)). Lento and LLF have not stated a plausible false advertising claim.

As stated earlier, Lento and LLF plead no facts for their Lanham Act claims other than that they have a mark (Lento Law Firm), they did not authorize Altman to use it, and Altman posted Pay Per Click ads on Google which use the Lento Law Firm name but direct web traffic to the Altman Firm's website. None of these non-conclusory facts demonstrate that anything Lento and LLF allege Altman and his firm did with their mark is likely to influence purchasing decisions. If a consumer clicks the link, it will take them to the K Altman Law website. If a consumer were specifically looking for the Lento Law Firm, it would recognize this immediately because of the logo in the top left corner of the site as shown in Image 1 of the Amended

Complaint. (Amended Complaint at ¶ 52). We are not sure how this could influence purchasing decisions. Nor have Lento and LLF pled anything to show a consumer would choose the Altman Firm specifically because the initial Google link they click happened to say, "Lento Law Firm."

Further, Plaintiffs have pled nothing to show they could plausibly satisfy a likelihood of injury. Lento and LLF do not aver to what a consumer can type into the search engine to make the purported ads appear. They have not alleged anything to the effect of these alleged false ads taking the place of or erasing any ads Lento and LLF may have placed themselves. Presumably, if someone is looking specifically for LLF, if they clicked the alleged link and it brought them to K Altman Law, they would correct their error. If the consumer was just searching for student defense law firms generally, Lento and LLF have pled no facts that suggest in any way these purported ads would decrease their sales or cost them any goodwill they might have.

The Lanham Act false advertising claim elements are conjunctive. They are not disjunctive or balancing factors. Lento and LLF must plead facts that plausibly show they can satisfy each of those five elements. They have not. Consequently, the Court will dismiss Count XII in its entirety, and, specifically, we will dismiss the unfair competition claim with prejudice.

### 11.     Count XIII: Declaratory Judgment

"The Declaratory Judgment Act, 28 U.S.C. § 2201(a), allows a court to enter a declaratory judgment by providing that, in 'a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought.'" *Lilac Dev. Grp., LLC v. Hess Corp.*, No. 15-7547, 2016 WL 3267325, at *2 (D.N.J. June 7, 2016) (quoting 28 U.S.C. § 2201(a)). The Act's purpose is to "'avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting

36

until his adversary should see fit to begin suit, after damage had accrued.' An additional purpose is to clarify legal relationships before they have been disturbed or a party's rights violated." *Travelers Ins. Co. v. Davis*, 490 F.2d 536, 543 (3d Cir. 1974) (quoting *E. Edelmann & Co. v. Tripe-A Specialty Co.*, 88 F.2d 852, 854 (7th Cir. 1937) (internal citations omitted)). Declaratory judgments are discretionary, not mandatory. *Id.* "Said discretion is to be exercised in accordance with sound judicial principles and the purposes of the Declaratory Judgment Act." *Id.* (quoting *Shell Oil Co. v. Frusetta*, 290 F.2d 689 (9th Cir. 1961)).

The purported oral contract between these parties is already dead. (*See* Amended Complaint at ¶¶ 83, 90, 100, 119) (stating that Altman has ceased working on the assigned cases). Both parties maintain the other breached the alleged agreement in different respects. That is why Lento and LLF filed suit here in the first place. They are not bringing suit for a declaratory judgment on the whole agreement before Altman sues. They brought their own full lawsuit. As such, in our discretion, we find that a declaratory judgment is inappropriate at this stage.

The Act's purpose is to avoid accrual *of avoidable damages*, afford *an early adjudication*, declare rights *before* damages accrue, and "clarify legal relationships *before* they have been disturbed or a party's rights violated." *Travelers Ins. Co.*, 490 F.2d at 543 (emphasis added). Every party before this Court maintains the agreement has already been breached and damages have already accrued. If Altman and the Alman Firm believe Lento and LLF owe them damages for breach of contract, that breach has already occurred, and they may bring such an action. It would serve no legitimate purpose to issue the declaratory judgment Lento and LLF seek on just one alleged term of the purported contract.

Therefore, we dismiss Count XIII with prejudice.

12.     **Count XIV: Tortious Conduct by Fictitious Individuals and Entities**

As far as the Court can discern, neither the Gill and Kresch Motion nor the Altman

Motion move to dismiss Count XIV or the fictitious defendants named in the Amended

Complaint. As such, the Court will not discuss Count XIV, and it will proceed.

## IV.     CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Gill and Kresch Motion (ECF

No. 26) in full and **GRANTS IN PART AND DENIES IN PART** the Altman Motion (ECF No.

27). In summary, the Court will allow to proceed: Count II against Altman only; Count IV

against both Altman and the Altman Firm; and Count XIV against the fictitious defendants. The

Court dismisses Count I in its entirety; it dismisses Count II as to Gill and Kresch, and therefore

dismisses Gill and Kresch as parties from this case; it dismisses Count III in its entirety; it

dismisses Count V in its entirety; it dismisses Counts VI, VII, VIII, IX, X, and XI in their

entirety **with prejudice**; it dismisses Count XII as to false advertising, and it dismisses Count

XII as to unfair competition **with prejudice**; and it dismisses Count XIII in its entirety **with

prejudice**. An appropriate Order follows.


Dated: June 27, 2023                                         /s/ Robert B. Kugler
                                                             ROBERT B. KUGLER
                                                             United States District Judge